WARREN COUNTY CIRCUIT COURT.

JOHN B. CLINE ET AL., RELATORS, v. THE STATE HIGH-
WAY COMMISSION OF NEW JERSEY, RESPONDENT.

For the relators, *McCarter & English.*

For the respondent, *Fred W. De Voe.*

On petition of relators an alternative writ of *mandamus* issued out of the Supreme Court commanding respondent to proceed to condemn certain lands described therein, in the event that it intended taking such lands for highway purposes, or to show cause why it should not be required so to do. Respondent answered that the land comprising the *locus in quo* was in fact part of a turnpike or toll road duly laid out in pursuance and by virtue of a special act of the legislature, entitled "An act to incorporate the Washington Turnpike Company, approved March 3d, 1806; that the road had been surrendered to the public, and the rights and privileges therein had been acquired by respondent by legislative au-

thority as a part of the state highway system. Relators filed
a reply traversing the alleged facts set forth in the answer;
whereupon, on the issues thus raised in the pleadings, the
proceeding was noticed and came on for trial before the court
and a jury at the Warren Circuit. On motion for the direc-
tion of a verdict in favor of respondent the court disposed
of it as follows:

LAWRENCE, J. It appears here that in 1806 certain gentle-
men were authorized by special act of the legislature to in-
corporate the Washington Turnpike Company, for the pur-
pose of operating a toll road approximately twenty-five miles
long over a route set forth in the act. It was comprehensive
in that it provided for the details of organization, the survey,
the acquiring of the necessary land and laying out of the
road, such provisions, in other words, as are usually found
in the general road acts. Those pertinent to this issue were
that within two years surveyors, or, as they were called, com-
missioners, appointed at the request of the turnpike company,
were to lay out the turnpike as the statute provided; that it
should not be less than four rods nor more than six wide,
and in the middle of such turnpike, so referred to in the act,
there should be built an artificial road thirty feet in width
with a hard surfaced center of twenty feet. It appears that
the survey was made by commissioners duly appointed and
filed as required in the office of the secretary of state; that
thereupon, the undisputed proof establishes, the turnpike com-
pany opened the road in accordance with the act, the artificial
portion of which was thirty feet wide with twenty feet thereof
hard surface. After being so built, as further provided, the
company requested the governor to appoint three commission-
ers to ascertain whether the road had been actually laid out and
built in compliance with the provisions of the statute. Such
commissioners were appointed by Governor Bloomfield in
1810, and they certified to him that they had viewed the road
and found that the work had been done in strict accordance
therewith, whereupon the governor issued a certificate au-
thorizing the company to collect tolls as contemplated by the

act, and the proofs show that it proceeded to do so. In actual operation, the traveled portion, undoubtedly, was the thirty feet mentioned in the statute as the artificial part of the turnpike, but I am inclined to the view, as a matter of law, that the actual possession under the survey was four rods wide in the section indicated therein as including the *locus in quo* and six rods as set forth in other parts of the route shown in such survey. I see no difficulty in arriving at this width. It contains a center line and, under the statute, the width of the turnpike was to be not less than four nor more than six rods wide. At the point of the *locus in quo,* the land claimed by the relators, it appears it was four rods wide under the survey, and, therefore, a measurement from the center line of the artificial part of the turnpike thirty-three feet on either side would sufficiently and adequately designate the side lines at the *locus in quo,* that is to say a width of four rods. I am disposd to disagree with counsel for the relators, consequently, that the survey should have been accompanied by a map showing side lines.

And so it appears that this turnpike was opened with the permission of the governor and toll taken for a period of years. Evidently the enterprise was not a financial success, for it further appears that in 1815 the property of the company was sold by the sheriff to an individual and that that individual held title for about eleven years, when he reconveyed it to the company, and it is fair to assume that they retained possession and operated the turnpike for four or five years more, when it was again sold to another person by the sheriff, and this time title was held for fourteen years, when the company recovered it, as indicated by the county clerk's record. Then, in 1853 (*Pamph. L., p.* 60), a supplement to the act of 1806 was enacted by the legislature for the purpose of enabling the turnpike company to change the road from a dirt highway to a plank road, upon the condition that there be raised, through the sale of its bonds, to defray the necessary expense, a capital fund of $100,000. It appears, however, that the scheme did not materialize, and it is again assumed that the company was unable to raise the necessary

fund. The result was that in 1854 it formally surrendered all its rights and privileges to the public by a cerificate in writing filed in the office of the clerk of Warren county. This was permitted by the supplement of 1853 and the turnpike accordingly became a public highway or road to be "used and maintained and repaired as other roads or highways of this state."

The question now arises whether anything more was legally surrendered than the traveled or beaten pathway of this turnpike. It is conceded that this traveled portion was at least thirty feet wide. In any event there seems to be no dispute that the thirty feet held as an artificial roadway is that to which reference has been made as thirty feet and the center line of which is the form for measuring the width of the turnpike as contemplated by the act of 1806. Therefore, it is a question of law whether or not the turnpike company surrendered the additional right or privilege it had to keep the entire width as contemplated by the act—not less than four nor more than six rods—and whether the public as represented by the various townships at the time, acquired anything more than the thirty feet of artificial roadway in the center of the so-called turnpike.

I am constrained to resolve that question in favor of the state for the reason that there was no throwing back of any land, no recapture of any land occupied by the turnpike by the property owners. It became a public highway; that is the law. There was no reversion of any portion of the turnpike, either of the artificial center theretofore made or of the adjoining width. I therefore determine the question as to what became a public highway in favor of the public as represented at that time by the various townships through which the route of the road ran. Later, so far as the *locus in quo* is concerned, the road was acquired and worked by the county and so held until 1917, when it became a part of the state highway system as route 12. *Pamph. L., p.* 25; see, also, *Pamph. L.* 1926, *p.* 377.

Now, I may say, it has been argued here that there is no proof that land to the extent of four rods or six rods was

ever acquired by this turnpike company; that, as a matter of fact, all it did was to build the artificial roadway of thirty feet. I do not believe that the court has the right to make any sort of an assumption that the company did not acquire an easement or right of way for this road less than four nor more than six rods wide, as indicated by the survey, for the reason that our courts have settled, it seems to me, definitely the principle that a road return made under authority of a statute, whether semi-private, as in this case, or by the public road acts, cannot be collaterally questioned, particularly so when there is found in section 5 of the 1806 act that there is no requirement of the company that it condemn any land unless some property owner aggrieved by the laying out of the turnpike demanded that it be done. So far as the record discloses no property owner objected to the route and consequently no condemnation proceedings were had, but on the contrary all property owners at the time appear to have acquiesced. It is therefore fair to assume, as a matter of law, that the commissioners who made the survey and the turnpike company officials, in turn, in building the artificial road of thirty feet in the center of the turnpike, complied strictly with the law and acquired all the land contemplated by the act.

I rest my ruling on the case of *Humphrey* v. *Woodstown,* 48 *N. J. L.* 588, 593, 595, where it was held that—

"A road may be opened, used and worked throughout its entire length and yet not used and worked on every foot of its entire breadth, and if the *locus in quo,* being within the lines of the road, was not actually passed over by the wheels of vehicles, it would not therefore be vacated. It has been settled in this state that encroachment on a highway cannot be legalized by lapse of time. If the public once acquires a right to any part of a road, it cannot be lost by negligence of public officers * * *. To protect highways from encroachments, which it is the business of no one to resist, requires that the public be allowed to resume its rights at any distance of time, disregarding any loss to those who have appropriated it and erected improvements on the public domain."

Therefore, I hold that the return, as filed in the office of the secretary of state, coupled with the report of the commissioners appointed by Governor Bloomfield, is conclusive that the turnpike company laid out, under the procedure provided by the act of 1806, the turnpike in question, not merely to a width of thirty feet, which was the artificial roadway directed by the act itself, but to a width of not less than four rods in the parts indicated in the survey and six rods in other portions thereof; that being so, then, I further think, as a matter of law, the survey not being susceptible of question or attack here, that the state acquired all the rights and privileges of the turnpike company in that regard and is not obliged to condemn any part of the *locus in quo* which is and always has been a part of the turnpike as laid.

As a result, my opinion is that the judgment must go against the relators and for the respondent, there being no disputed question of fact involved; holding, as a matter of law, that the width of the turnpike through the *locus in quo* is, by simple mathematics, to be ascertained by measuring thirty-three feet on either side of the center line of the traveled way. When this is done, it will be found that as certified in the report and survey of the commissioners, as required by the act, the turnpike was laid four rods (or sixty-six feet) wide, especially at the *locus in quo* and includes it.

The jury is directed to return a verdict in favor of the respondent and against the relators. (A verdict was so returned and *postea* signed accordingly.)