92 N.J. Super. 125 (1966)
222 A.2d 301
SUBURBAN GOLF CLUB OF ELIZABETH, NEW JERSEY, A NEW JERSEY CORPORATION, PLAINTIFF,
v.
STATE HIGHWAY COMMISSIONER OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Law Division.
Decided July 20, 1966.
*128 Mr. Robert P. McDonough for plaintiff (Messrs. Lindabury, McCormick & Estabrook, attorneys).
Mr. Joseph Lipkin, Deputy Attorney General, for defendant (Mr. Arthur J. Sills, Attorney General, attorney).
BARGER, J.S.C.
This is an action in lieu of prerogative writs brought by Suburban Golf Club (hereinafter called Suburban) to compel the State of New Jersey (hereinafter the State) to condemn certain lands alleged to be owned by Suburban which were taken by the State for highway purposes without compensation to Suburban. The State contends that Suburban does not have any title in the lands and, therefore, there is nothing to condemn.
The facts are stipulated.
Suburban has been the owner for many years of a golf course in the Township of Union, Union County. A portion of said golf course fronts on Morris Ave., at one time known as Morris Turnpike and now designated as New Jersey State Highway S-24.
*129 Sometime in November 1936 the State, through its agent the State Highway Commissioner, and Suburban entered into an agreement under which Suburban was to convey two parcels of land, namely, 14A and 14B on Exhibit PD-6, to the State in exchange for a consideration of $7,500 and the conveyance to it by the State of eight parcels of land, designated 106X, 101BX, 14V1A, 14V2A, 14V1B, 14V2B, 14V1C and 14V2C on that exhibit. The transfer of title from the State to Suburban was by quitclaim deed. This transaction was part of the State project designed to straighten out a bend in Morris Avenue, the State Highway Commissioner having determined that it was necessary to procure the two parcels owned by Suburban and that the eight parcels to be conveyed to Suburban were no longer required by the State for highway purposes.
In consummation of the agreement, the deeds for the respective parcels and the $7,500 consideration paid by the State to Suburban were exchanged on March 24, 1937, and Suburban's deed from the State for the parcels which covered the old road bed of Morris Avenue was recorded in the office of the Register of Union County on April 13, 1937. These parcels, which are six in number, appear as 14V1A, 14V2A, 14V1B, 14V2B, 14V1C and 14V2C on the above-mentioned exhibit.
Suburban has remained in possession of the property set forth in the above-mentioned deed from the State, except for the hereinafter referred to parcels taken by the State and put to highway use in 1963 which are now the subject matter of this action, and paid taxes continuously thereon to the Township of Union and generally exercised the rights of ownership over the property concerned from the date of the transfer of title to it. Since the property was conveyed to Suburban in 1937 and prior to its taking by the State in 1963, it had been used as part of the "rough" of the seventh hole of the golf course. The old road bed was impassable because of growth over the years of trees and underbrush thereon, and it was not accessible to the public because of *130 possession and use by Suburban and the fences erected and maintained by the State Highway Department along Morris Avenue.
Sometime during the year 1963 the State Highway Commissioner determined that it would be necessary to construct a new road known as a "jug handle," adjacent to Morris Avenue, to facilitate the movement of traffic to and from a large shopping center recently erected across from Suburban's golf course and to relieve congestion and facilitate safety because of the increasingly large volume of traffic on that part of Morris Avenue. Upon learning through its title search that Suburban had never applied to the County of Union for vacation of its highway use easement over the six parcels above mentioned, the State Highway Commissioner, without the knowledge or consent of Suburban, applied to the County of Union for and received a vacation of two of the parcels named above, i.e., 14V1C and 14V2C, and for portions of two of the other parcels also named above, i.e., 14V1B and 14V2B, for the construction of the "jug handle." These parcels constitute the subject matter of this suit.
After procuring the resolution from the Board of Freeholders of Union County vacating any highway use easement that they may have had affecting parcels 14V1C, 14V2C, 14V1B and 14V2B, the State Highway Commissioner entered upon the land and took it for public highway purposes. He has offered to compensate Suburban for all lands the State has taken except the above-mentioned four parcels which lie in the old road bed of Morris Avenue, the Commissioner contending that the deed to the latter parcels was ultra vires and void as not having been given in compliance with N.J.S.A. 27:12-1, and also that the State had no title to said parcels which it could convey by the above-mentioned deed and, therefore, that no title exists in Suburban.
Four primary issues arise in this action: (1) whether the State Highway Commissioner's deed of March 24, 1937 to Suburban for parcels 106X, 101BX, 14V1A, 14V2A, 14V1B, 14V2B, 14V1C and 14V2C was ultra vires and void; (2) *131 whether the State is estopped from asserting title in derogation of its deed to Suburban if the same is valid; (3) whether the State is equitably estopped under the stipulated facts, and (4) what title Suburban received to the parcels in question through the State Highway Commissioner's deed, if such deed is valid and the State is not estopped.
The case law of New Jersey is sparse on the issues above enumerated. The court's research has therefore extended to other jurisdictions and sources of legal information.
Is the State's deed to Suburban ultra vires and void? In order to be valid the procedure followed must comply with N.J.S.A. 27:12-1, entitled "Disposition of property not needed for public use" and which provides:
"When real estate or any right or interest therein has or shall have come into the possession or control of the commissioner, or when he has or shall have taken real estate or any right or interest therein, in the name of the State for the use of the State in the improvement, betterment, reconstruction or maintenance of a State highway, and the commissioner has or shall have determined that the property so acquired is no longer required for such use, he may:

* * * * * * * *
c. Sell at public sale to the highest bidder; and
d. Exchange for other lands 
All or any portion of such real estate, or any interest therein, with or without improvement thereon, including the hereditaments, appurtenances, easements and rights of way, and make the necessary conveyance of same."
(The amendments of L. 1938, c. 407 and L. 1954, c. 74 made no changes in the above cited portion of N.J.S.A. 27:12-1 in effect at the time of the conveyance with which the court is here concerned.)
The deed from the State to Suburban, executed on March 24, 1937 by the then State Highway Commissioner Sterner, recites a consideration of "One Dollar ($1.00)" and "other valuable consideration" and does not indicate on its face whether the transfer was by "sale" or "exchange" under the provisions of N.J.S.A. 27:12-1. However, Exhibit PD-1, the "Stipulation of Facts," indicates the nature of the transaction there involved. Paragraph 1 states that "Suburban agreed to sell to the Commissioner, parcels 14A and 14B, in *132 exchange for a conveyance by the Commissioner to Suburban of certain other parcels, namely, 106 X, 101BX, 14V1A, 14V2A, 14V1B, 14V2B, 14V1C and 14V2C, and the sum of $7,500.00."
Neither "sale" or "exchange" is defined in N.J.S.A. 27:1-1 et seq which deals with highways. Likewise, R.S. 1:1-2, headed "Words and Phrases Defined," is not helpful since no definition of either "sale" or an "exchange" is therein set forth. The general rules of construction laid down in R.S. 1:1-1 are:
"In the construction of the laws and statutes of this state, both civil and criminal, words and phrases shall be read and construed with their context, and shall, unless inconsistent with the manifest intent of the legislature or unless another or different meaning is expressly indicated, be given their generally accepted meaning, according to the approved usage of the language. Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning." (Emphasis added)
Black's Law Dictionary (4th ed., 1951) defines "Sale" as "A contract between two parties, called, respectively, the `seller' (or vendor) and the `buyer' (or purchaser) by which the former, in consideration of the payment or promise of payment of a certain price in money, transfers to the latter the title and the possession of property." And "Exchange" is set out under the subheading "Conveyancing" as "A mutual grant of equal interests (in lands or tenements), the one in consideration of the other." Under the main heading "Exchange" it is said that "The criterion in determining whether a transaction is a sale or an exchange is whether there is a determination of value of things exchanged, and if no price is set for either property it is an `exchange'." Id., citing Gruver v. Commissioner of Internal Revenue, 142 F.2d 363, 366 (4 Cir. 1944). These general rules and definitions do not entirely cover our situation since, in addition to the payment of the sum of $7,500, there was a mutual transfer of property, the respective values not being factually indicated.
*133 New Jersey is not without law on the subject. The leading case in New Jersey defining an exchange is Haber v. Goldberg, 92 N.J.L. 367 (E. & A. 1918). It is cited frequently and states the common law rule as follows:
"`An exchange is a mutual grant of equal interests, the one in consideration of the other. The word "exchange" is so individually requisite and appropriated by law to this case, that it cannot be supplied by any other word or expressed by any circumlocution. The estates exchanged must be equal in quantity; not of value, for that is immaterial, but of interest: As fee simple for fee simple, a lease of twenty years for a lease of twenty years, and the like.' 2 Bl. Com. 323." (at p. 369)
This rule is elaborated upon at page 371 where it is stated:
"Because part of the consideration of a sale of land is the conveyance to the grantor of certain other land, the transaction does not thereby become one of exchange of estates at common law. The fact that part of the consideration, or all of it, is land, does not in and of itself amount to a technical exchange. That occurs only * * * when the exchange is of equal interests (not of value, but estates), and when the conveyance, whether by a single deed, or by deeds exchanged between the parties  if that be allowable, and doubtless it is, although only one deed is required  and the conveyance, or conveyances, provide for re-entry upon ouster or eviction."
Haber reviews the law of other jurisdictions; Wilcox v. Randall, 7 Barb. 633 (N.Y. 1849), is cited, wherein it was said, in holding a transaction not to be an exchange:
"* * * if the rule is to prevail, where half of the consideration consists of money or personal property, the other half being land, it may also prevail where 1,000 acres of land are exchanged for a single acre and $9,000 in money." (at p. 636)
This statement well illustrates the confines of the definition.
It is clear, applying the facts of this case to the above definitions, that the transaction consummated by the parties in 1937 was not an exchange but a sale, and the court so finds. Therefore, the State Highway Commissioner should have complied with N.J.S.A. 27:12-1(c) and should have sold at public sale. His action under N.J.S.A. 27:12-1(d) *134 was improper; however, it was not ultra vires because there was authority under N.J.S.A. 27:12-1(c) to sell said property even though the exercise of this authority was also improper.[1]
No case involving a state agency and its merely improper exercise of granted authority has been found. Analogous to this situation, however, are those cases in which municipal officials have irregularly exercised authority granted by the state. See Potter v. Borough of Metuchen, 108 N.J.L. 447, 450 (Sup. Ct. 1932), for a discussion of this and four other related facets of the problem. The rule is that where there is no lack of authority in the municipality or its agents to make the contract but the defect is in an irregular exercise of such authority, a recovery may be had because one contracting with a public body is not obliged to scrutinize, at his peril, the corporate proceedings. Id., at p. 450. This is still the rule, Samuel v. City of Wildwood, 47 N.J. Super. 162 (Ch. Div. 1957). There the court characterizes this situation as one ultra vires in the secondary sense and states:
"* * * where an act is ultra vires in the secondary sense, i.e., where the municipality has the power to perform an act but the performance is irregular in some particular which is not jurisdictional, the municipality may, under certain circumstances, ratify the same or be estopped from urging its ultra vires nature as a defense. Summer Cottagers' Ass'n of Cape May v. City of Cape May, supra; Car Spring and Rubber Co. v. City of Jersey City, 64 N.J.L. 544 (E. & A. 1900); Bourgeois v. Board of Chosen Freeholders of Atlantic County, 82 N.J.L. 82 (Sup. Ct. 1911); Potter v. Borough of Metuchen, supra; DeMuro v. Martini, 1 N.J. 516 (1949)." (at p. 169)
It must be borne in mind that, in any event, the legislatively required exercise of authority, as herein indicated, sometimes referred to as power, in a given manner cannot be so relaxed as to defeat the public policy sought to be served, *135 and if this occurs there can be no estoppel. Id. The general public policy sought to be served by N.J.S.A. 27:12-1(c) is self-evident. It was stated in 405 Monroe Co. v. City of Asbury Park, 40 N.J. 457 (1963):
"* * * The law has become increasingly sensitive to the need for business integrity in public transactions as well as in private ones. True it is important to protect the public against official imprudence, but there is also the moral principle that a government which would encourage fair dealing in private transactions should insist upon nothing less of its own agencies. It is one thing to expect officials to know and stay within their power and to call them to account if they willfully exceed it. It is something else to ask all who deal with a municipality to bear the burden of officialdom's ignorance of its own authority.
* * * In broad terms, it may be said that where a contract is beyond the power of the municipality or where the Legislature has explicitly barred any liability if a restriction upon the exercise of power is not met, relief ordinarily will be denied. Slurzberg v. [City of] Bayonne, 29 N.J. 106, 115 (1959); Bauer v. [City of] Newark, 7 N.J. 426, 434-435 (1951). But if the difficulty is an irregularity in the exercise of a power the municipality does have and the Legislature has not decreed the consequences of the irregularity, our cases seek a just result. * * *" (at p. 462)
The same applies here. The court concludes that the transaction in question was improper, as herein indicated, but not strictly ultra vires since there was only an irregular exercise of the authority granted. Although the transaction was not technically an exchange, it had some of the elements thereof, it did not invade the public purpose behind the statute, for there is no evidence of any bad faith or conduct on the part of any of the parties contrary to public policy and welfare.
Is the State estopped from asserting title in derogation of its deed to Suburban? In answering this question the court must first determine if the title it is asserting is actually in derogation of its deed.
As mentioned previously, the deed in question is a quitclaim deed. In 19 Am. Jur., Estoppel, § 19, pp. 617-618, (1939), wherein the effect of a quitclaim deed on estoppel by deed is discussed, it is stated:
*136 "As a general rule a quitclaim deed, not affirming, either expressly or by implication, the existence of any estate or interest in the grantor, does not estop him from asserting an after-acquired title or interest.

* * * * * * * *
Where, at the time of a quitclaim, the grantor has any title or interest, whether particularly designated in the deed or not, which though inchoate and incomplete as a legal title or interest, is nevertheless of such a character as to pass to the grantee under the granting clause, the subsequent confirmation or completion of that title or interest will inure to the benefit of the grantee. This is especially true where the grantor in a quitclaim deed has a perfect equitable title at the time and subsequently acquires the legal title * * *."
No chain of title relating to this highway, commonly referred to down through the years as the Morris Turnpike, and more particularly to the parcels in question, has been found either into or out of the Morris Turnpike Company incorporated by an act of the General Assembly on March 9, 1801. L. 1801, c. 38.[2] However, the court concludes from the deed with which it is concerned, and the lack of evidence to the contrary, that the State had a title interest in the subject parcels. Such is the natural inference from all the circumstances. The deed recites that "the said State did acquire certain lands and premises, hereinafter more particularly described * * *." Parcels 14V1B, 14V2B, 14V1C and 14V2C are among those therein described. N.J.S.A. 27:6-1 designates certain routes as a part of the state highway system. The old route of Morris Avenue with which we are concerned was one of them at the time of the subject conveyance. L. 1927, c. 319, § 17, as amended by L. 1929, c. 126, § 11. The initial authority to construct the road arose from the State. There is no evidence of title's ever having been in anyone else. The County of Union had only the usual highway easement right. Buttressing this finding is the fact that the State was not able to present to the court, either at *137 the initial or subsequent oral argument, by the exhibits presented thereat, or in the numerous communications had with the court, any evidence tracing the title to the parcels in question to any other person or corporation up to the date they were transferred to Suburban. Certainly, there is no conclusive evidence that on the date of the deed in question the State did not have title. The court is of the opinion that the State had the requisite title interest to bring it within the exception to the general rule where a quitclaim deed is involved, which is set out above. Cline v. State Highway Com. of N.J., 6 N.J. Misc. 331, 141 A. 577 (Cir. Ct. 1928).
The landmark New Jersey case of Hannon v. Christopher, 34 N.J. Eq. 459 (Ch. 1881), fully discusses estoppel by deed and its basis. A bargain and sale deed without warranties was there in question, but the rules laid down and the reasons there set forth are equally applicable here. Robeson v. Duncan, 74 N.J. Eq. 745 (Ch. 1908). Hannon v. Christopher poses the question, "Do the recitals of this deed create an estoppel * * *?" and answers the query thus:
"There is an apparent conflict in the adjudications upon the question whether a deed of bargain and sale, without warranty of title, but containing recitals showing that the parties evidently dealt under a belief that the grantor was seized of a greater estate in the lands than he actually had at the time of its execution, will bind or transfer, by estoppel, a contingent or subsequently acquired estate. Some seem to hold that a grant in this form is utterly inefficacious to pass an estate not yet vested, and can only operate as a conclusion between the parties and their privies on an estate vested at the time of its execution; while others, resting upon a much more liberal and just basis, hold that whether a contingent or an after-acquired interest will pass by estoppel, as the result of a conveyance in this form, depends entirely upon whether it was the intention of the parties to convey it, and that whenever it clearly appears that such was their intention, it is the duty of the court to adjudge an estoppel, in order that the deed may be carried into effect according to the minds of the parties. No review of the learning on this subject will be attempted. The limits of a judicial opinion are neither sufficient nor adapted to such an undertaking. The cases will be found collected in the American notes to the Duchess of Kingston's case, 2 Smith's L.C. 623, et seq.
*138 In my opinion, the latter view is the correct one. It commends itself to my sense of justice as being in entire accord with certain fundamental doctrines of the law, and it is obviously better adapted to promote and further justice than its opposite. It appears to be a natural deduction from, if not an actual exemplification of, that great principle which declares that in searching for the meaning of an instrument, that interpretation shall prevail which is `as near the minds and apparent intent of the parties as it possibly may be, and the law will permit.' Shep. Touch. ch. V. p. 85. And `if it cannot operate in one form, it shall operate in that which, by law, will effectuate the intention of the parties.' Goodtitle v. Bailey, Cowp. 597.
The most accurate and lucid statement of the essentials of such an estoppel that has come under my observation, is that given by Mr. Justice Nelson, in pronouncing the opinion of the Supreme Court of the United States, in the case of Van Rensselaer v. Kearney, 11 How. 297, 301, in which he says:
`That if the deed bears on its face evidence that the grantor intended to convey, and the grantee expected to become invested with an estate of a particular description or quality, and that the bargain proceeded upon that footing between the parties, then, although it may not contain any covenants of title, in the technical sense of the term, still, the legal operation and effect of the instrument will be as binding upon the grantor and those claiming under him, in respect to the estate thus described, as if a formal covenant to that effect had been inserted, at least so far as to estop them from ever afterward denying that he was seized of the particular estate at the time of the conveyance.'
Then, after a careful examination of several previous adjudications, both by the courts of England and this country, he further states:
`The principle deducible from the authorities seems to be that whatever may be the form and nature of the conveyance to pass real property, if the grantor sets forth on the face of the instrument, by way of recital or averment, that he is seized or possessed of a particular estate in the premises, and which estate the deed purports to convey, * * * the grantor, and all persons in privity with him, shall be estopped from ever afterwards denying that he was so seized and possessed at the time he made the conveyance. The estoppel works upon the estate, and binds an after-acquired title as between the parties and privies. The reason is that the estate thus affirmed to be in the party at the time of the conveyance, must necessarily have influenced the grantee in making the purchase, and hence the grantor and those in privity with him, in good faith and fair dealing, should be forever thereafter precluded from gainsaying it.'
The rule thus established was subsequently affirmed in French v. Spencer, 21 How. 228. Chancellor Walworth, prior to the decision of Van Rensselaer v. Kearney, had enunciated the same doctrine, substantially, in giving his opinion, as a judge of the court of errors of New York, in Jackson v. Waldron, 13 Wend. 178; and his formula of the rule was subsequently quoted and approved in Fitzhugh v. Tyler, 9 B. Mon. 559. The learned editor of the American notes to *139 the Duchess of Kingston's case, states that the fair result of the more recent cases would seem to be, that whenever the terms of the deed, or of the covenants which it contains, clearly show that it was meant to convey an absolute and indefeasible title, and not merely that which the grantor had at the time, it will bind and pass every estate or interest which may vest in him subsequent to its execution, whether the warranty which it contains be general or special, and although it may contain no warranty whatever. 2 Smith's L.C. 636. In the language of Mr. Justice Nelson, it is clear that this doctrine is founded upon the highest principles of morality, and recommends itself to the justice and common sense of every one." (at pp. 463-465)
The reasoning of the Hannon case, and the specific language of 19 Am. Jur., Estoppel, § 19, quoted above, wherein "any title or interest" in the grantor is deemed sufficient to bring a quitclaim deed within the doctrine of estoppel by deed, compel the court to invoke that doctrine in this case in view of the language in the deed in question and the intentions of the parties as symbolized by the nature of the transaction involved.
The fact that the deed here in question is from the State poses no problem in view of the over-all facts before the court. See Annotation, 23 A.L.R.2d, 1419 (1952), and the discussion in this opinion infra.
Simply stated, the doctrine of estoppel by deed is this: A grantor is generally estopped from denying the title of his grantee. And further, a grantor who executes a deed purporting to convey land to which he has no title, or to which he has a defective title at the time of the conveyance, will not be permitted, when he afterward acquires a good title to the land, to claim in opposition to his deed to the grantee. 19 Am. Jur., Estoppel § 10, p. 606, and § 12, p. 610.
The court having found that the State is estopped from asserting title in derogation of its deed, it need not consider whether the State is equitably estopped. However, it deems it pertinent to do so because the equities of the situation before the court are so pronounced and because many of the pertinent cases considering situations such as this have resolved and determined them on the basis of equitable estoppel, as the discussion to follow will indicate.
*140 Is the doctrine of equitable estoppel invocable against the State? The general rule is that the doctrines of laches and equitable estoppel are not applied against the State to the same extent as against private parties. Abbott v. Beth Israel Cemetery Ass'n of Woodbridge, 13 N.J. 528, 548 (1953). This rule is predicated on the basis that otherwise the State might be rendered helpless to assert its powers in government. 19 Am. Jur., supra, § 166, p. 818.
Certainly, the State cannot be estopped by the unauthorized acts of its officers and agents. Id. Here, the act of the State Highway Commissioner was not unauthorized. The procedure he followed was only improper, as indicated above. In Midtown Properties, Inc. v. Township of Madison, 68 N.J. Super. 197 (Law Div. 1961), affirmed 78 N.J. Super. 471 (App. Div. 1963), which involved a municipal corporation, it was said:
"It is true that an estoppel may be urged against a public body where the public body has the authority to make the contract, but because of some technicality has not properly exercised its power  such does not apply to contracts which are ultra vires and void ab initio." (at p. 208)
The court has found no New Jersey case which considered estoppel against the State in which any such similar statement has been made, but concludes that this statement is equally applicable to this case. Support for this conclusion is found in Scott County, Ark. v. Advance-Rumley Thresher Co., 288 F. 739, 36 A.L.R. 937 (8 Cir., 1923), where it was held that the county possessed the power to make a contract and that was estopped to question the validity of that contract on the ground of an improper exercise of that power after it had retained the benefits of the contract for a considerable period of time. There the county was regarded as an agency of and constituent part of the state and was thus subject to an estoppel only to the same limited extent as the state itself. The court is therefore faced squarely with the issue of equitable estoppel.
*141 In 19 Am. Jur., Estoppel, § 166, at p. 819, it is said:
"* * * a contract or deed lawfully made by a state may create an estoppel against it if the effect of the estoppel will not be to impair the exercise of the powers of government. Moreover, an estoppel may arise against the state out of a transaction in which it acted in a governmental capacity if an estoppel is necessary to prevent loss to another and the perpetration of a fraud and if such estoppel will not impair the exercise of the sovereign powers of the state."
The court finds that in this case there will be no impairment of the sovereign powers of the State, for its right to condemn in the present or future are not affected and there is no violation of public policy or welfare  in fact, the policy expressed by the New Jersey Constitution and statutes is to the effect that the State should not take private property without just and reasonable compensation. N.J. Const., Art. I, par. 20; N.J.S.A. 20:1-1 et seq; N.J.S.A. 27:7-22. An equitable estoppel is necessary to prevent loss to Suburban and a manifest injustice since the parties can in no other way, but by the payment of money, be placed in statu quo.
Of the numerous New Jersey cases this court has examined and which have denied the application of equitable estoppel against the State, most have rested on the ground that no prejudice was evident to the other party. See, e g., Abbott v. Beth Israel Cemetery Ass'n of Woodbridge, supra. In Schultz v. Wilson, 44 N.J. Super. 591 (App. Div. 1957), it was said, after indicating the general rule that estoppel is not liberally applied against the State:
"Ordinarily, sovereign rights are not lost solely because of the delay or inaction of those entrusted with their enforcement. We discern no prejudice visited upon appellant by reason of the State's alleged inaction in enforcing its rights * * *." (at p. 605)
Here, there is much more than inaction and delay on the part of the State, although those elements are also present, and there is definitely "prejudice visited upon" Suburban. Corporations, like individuals, in dealing with other parties must *142 live up to the rules of common honesty. Hall v. Pauser, 128 N.J.L. 211, 214 (Sup. Ct. 1942). There appears to be no good reason why this principle should not apply as a matter of equity to the common business transactions of the State.
No New Jersey cases are directly on point, but an examination of decisions in other jurisdictions supports the court's reasoning. See, e.g., Daniel v. Sherrill, 48 So.2d 736, 23 A.L.R.2d 1410 (Fla. Sup. Ct. 1950). At least as early as Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810), it was held that a party to a contract cannot pronounce its own deed invalid, although that party is a sovereign state.
To rule in favor of the State in this action would frustrate equity and justice. Equity recognizes no rule as binding which will constrain it to do injustice. Following the legal contentions of the State in this case would do so, for it would allow the State to acquire the property rights of another without just and reasonable compensation as required by law. N.J. Const., Art. I, par. 20; N.J.S.A. 20:1-1 et seq; N.J.S.A. 27:7-22. In 1937 the intention of the parties to exchange certain lands to accommodate the State's public purpose was clear and the transaction was consummated in good faith. The agreements contained in the deeds should be carried out as a matter of justice to all and, as indicated herein, any after-acquired rights affecting the premises in question vest in Suburban. Hannon, supra.
Under the legal findings of this court it is clear that Suburban received legal title to the parcels in question. In view of this, the State is obligated to pay reasonable compensation for those lands of Suburban taken for public use. The State is accordingly ordered to institute, under the cited statutes, condemnation proceedings.
NOTES
[1] Compare the wider authority given municipalities in regard to exchanges of land where money consideration may be received under N.J.S.A. 40:60-51.1. It is noted that this statute does not authorize any payment thereof by a municipality.
[2] The expressed purpose of this act was to facilitate travel and communication from Elizabethtown in Essex County through Morristown in Morris County and thence into Sussex County.