**COMMONWEALTH of Kentucky, DEPART-MENT OF HIGHWAYS, Appellant,**

**v.**

**Waldo FULTZ, Bertha Fultz, and First National Bank of Grayson, et al., Appellees.**

Court of Appeals of Kentucky.

June 22, 1962.

Rehearing Denied Oct. 12, 1962.

John B. Breckinridge, Atty. Gen., H. D. Reed, Jr., Asst. Atty. Gen., Linza B. Inab-

nit, Legal Section, Dept. of Highways, Frankfort, for appellant.

O. F. Duval, W. H. Counts, Olive Hill, for Waldo Fultz, Bertha Fultz, and First Nat. Bank of Grayson.

W. H. Counts, Olive Hill, R. C. Littleton, Grayson, for Sherman Shumate and Lena Shumate.

Thomas D. Theobald, Grayson, W. H. Counts, Olive Hill, R. C. Littleton, D. V. Kibbey, Grayson, for Joyce Martin, Bennie Martin, Sherman Shumate and Lena Shumate.

H. R. Wilhoit, Grayson, for S. C. Tabor.

H. R. Wilhoit, Grayson, for Earl McGlone and Lena McGlone.

O. F. Duval, Olive Hill, H. R. Wilhoit, Grayson, for W. C. Preston (substituted as appellee–defendant in place of Standard Oil Co.), and L. C. Barker.

Wm. C. Kibbey, Grayson, for Wheeler Parsons, Opal Parsons, Mrs. Effie Johnson, D. V. Gearhart and Maggie Gearhart.

PALMORE, Judge.

Thirteen appeals by the state highway department from orders and judgments of the Carter Circuit Court in or arising out of condemnation cases have been consolidated for joint consideration. This opinion disposes of them all.

We are confronted with a procedural nightmare. In 1957 the state filed proceedings under KRS 177.081 et seq. to condemn 38 pieces of real estate on Main Street in the city of Olive Hill, so as to carry out a program of reconstructing U. S. Highway 60 through the heart of that city. The awards made by the commissioners (KRS 177.083) were considered excessive, so the state appealed each of the county court judgments to the circuit court on the question of amount. The landowners appealed also on the same question. In the circuit court one of the cases, that of the appellees

McGlone and wife, was tried before the jury as a test case and resulted in a verdict of $5000 as contrasted with an $1800 award in the county court and the state's original appraisal of $1200. Thereafter, on March 6, 1958, Commissioner of Highways James W. Martin issued an official order describing the project and concluding as follows:

"Due to the excessive cost of 38 parcels of right of way that had to be condemned, as evidenced by County Court awards on said 38 parcels of right of way, it is thought to be .in the best public interest to abandon the proposed subject project as originally planned.

"Therefore, the subject project is hereby abandoned, without prejudice, and all authorization to acquire right of way that has not been agreed upon and paid for before the date of this Order is hereby withdrawn.

"This Order is not intended to and does not abandon the right of way already acquired and paid for; and in order to utilize as much of the acquired right of way as possible, the Director of Design is hereby directed to make an alternate survey between the junction of U.S. 60 and Ky. 174 and a point near Fields Bridge over Tygarts Creek in such a manner as to miss the main business section of Olive Hill."

On the next day the state moved the circuit court to dismiss without prejudice each of the actions pending before it, and this was done by orders reading in part as follows:

"On motion of said Commonwealth of Kentucky, Department of Highways, notice of said motion having been given as required by law, this action is hereby dismissed without prejudice at the cost of the Commonwealth of Kentucky, Department of Highways.

"On motion of the Court any appeal taken by property owners having become moot the same is hereby dismissed."

(The form of the order in the McGlone case was different from the others in that it specifically set aside the county court judgment and dismissed "this entire action.")

During the spring and summer of 1958 the mayor and other citizens of Olive Hill interceded with various property owners who had been involved in the condemnation proceedings and made several visits to Frankfort in an effort to have the project reinstated according to the original plan. Meanwhile, on July 1, 1958, Dr. Martin was succeeded as Commissioner of Highways by Hon. Ward J. Oates, who went to Olive Hill and met personally with some of the interested citizens. In August of 1958 the right-of-way director for the highway department contacted and made tentative settlements with a number of the landowners based upon re-appraisals at higher prices. These efforts culminated in a new order issued by Commissioner Oates on August 29, 1958, providing in part as follows:

"It has now become apparent after many conferences and further negotiations with City Officials and property owners that the necessary right of way can be acquired for a reasonable sum of money and it is considered feasible at this time to reinstate Official Order No. 51076 in its entirety.

"It is, therefore, authorized and directed that Official Order No. 51076 be, and hereby is, reinstated in its entirety and becomes of full force and effect as of the date of this order.

"Official Order No. 54294, the order of abandonment, is hereby cancelled, set aside and held for naught."

In September of 1958 the state filed new condemnation suits in the Carter County Court against the owners with whom it still could not settle. The commissioners appointed in these proceedings made awards considerably lower than those made in the original 1957 actions (which we shall call the old suits). For example, on six of the seven pieces of property involved in the appeals before us now the new awards totaled $45,322 as against $115,726 under the old. When the owners were summoned to answer they pleaded the old judgments in bar of the new suits, alleging among other things that the state had not acted in good faith in abandoning the old suits. In two of the cases (Tabor and Standard Oil) it was alleged that the state's appeals to the circuit court in the old suits had been dismissed on technical grounds, hence the county court judgments remained in full force and effect. The McGlones took the position that if the state was entitled to take their property at all it was bound by the $5,000 jury verdict hereinbefore mentioned. The other owners made the same contention with respect to the commissioners' awards made in the old suits.

At this stage the regular judge of the county court vacated the bench and the adversary parties agreed on the appointment of Hon. Frank C. Malin, a distinguished member of the Ashland bar, as special judge to determine the issues raised by the pleadings of the property owners. After hearing evidence submitted by both sides covering the circumstances attending the abandonment and reinstatement, on September 19, 1959, he entered judgments dismissing the new suits on the ground that there "was never a permanent, unconditional abandonment in good faith of the project. * * * and the plaintiff is bound by the judgments rendered in said previous actions." The state promptly appealed these judgments to the circuit court.

Now the case took an incredible procedural turn. The state filed in the circuit court motions *in the old suits*, which had been dismissed without prejudice a year and a half before and were no longer on the docket, requesting permission to deposit either the amounts of the county court judgments (in the McGlone case, the amount of the jury verdict) in these old suits or the amounts of the commissioners' awards in the new suits, "without prejudice

to any rights of appeal in either action," and thereupon to take possession of the respective properties. The property owners responded to this exotic maneuver by special appearances seeking to quash it. As best we can interpret the record, however, the circuit court apparently took the practical approach of treating these motions as if they had been made in the new suits. Accordingly, on September 29, 1959, he entered in each of the new suits an order (a) taking under submission the question pending on the appeal, (b) directing that the amount awarded in the old suit be substituted for that awarded in the action then pending before him on appeal, (c) authorizing the state to take possession upon payment or deposit of that amount, and (d) providing that such payment and taking of possession would not prejudice "the rights of either party in either action as to the rights of appeal or any other matters open for determination" or "be considered as a recognition of the validity of the judgment of the county court in the former action."

Following entry of the foregoing orders the state paid into court the amounts awarded in the old suits (in the McGlone case, the amount of the jury verdict) and took possession of the property. The sums thus deposited were paid by the clerk of the circuit court to the respective property owners.

On December 11, 1959, the circuit court entered findings of fact, conclusions of law and judgment in the new suits. This judgment recited that by agreement the cases had been submitted on the record made before Judge Malin in the county court. It found "that there was no abandonment in good faith" of the old suits by the state and that the new suits were but a transparent attempt to obtain new trials and lower awards; concluded that the state was "bound" by the judgments and awards made in the old suits and that the owners were entitled to the amounts thereof; and, in effect, dismissed the actions. Six of the state's appeals now before us are from this judgment.

On February 15, 1960, the state moved the circuit court under CR 60.02 to set aside the orders entered in March of 1958 dismissing the old suits, and to redocket them for trial. These motions were overruled by an order reciting that the events subsequent to the 1958 dismissals, including the shipwreck of the new suits, provided no basis for relief in the old suits. Six of the state's present appeals are from this order, and they involve the same appellees as the six appeals from the final judgment of the circuit court in the new suits.

The thirteenth case, which we shall call the Parsons-Johnson case, is different from the others. It concerns the lessee and sublessee of business premises that were the subject of one of the original 1957 condemnation suits dismissed without prejudice in March of 1958. At some time thereafter the landlord evidently settled with the state, and the property is not involved in the new suits. However, when the state undertook to assume possession the lessee and sub-lessee filed suit in the circuit court to enjoin it from ousting them without paying the amounts awarded to them by the county court in 1957. The 1957 county court judgment shows that a total of $37,350 was awarded for the property, and according to a copy of the report of commissioners attached to the complaint it was apportioned $26,350 to the landlord and $5500 each to the lessee and sub-lessee for "damage to estimated business."

In defense to these claims the state pleaded, inter alia, the abandonment and dismissal of the 1957 action and alleged also that the lessee was but a month-to-month tenant, hence neither he nor his sub-tenant had a compensable interest in the property. Before ruling on the merits the circuit court permitted the state to take possession and required it to pay the $11,000 to the plaintiffs without prejudice to the rights of any of the parties. On December 18, 1959, final judgment was entered on the pleadings, and it reflected the same findings and conclusions theretofore stated in the December 11, 1959, judgment in the new

suits involving the other properties heretofore mentioned. The state therefore was held "bound" by the 1957 county court judgment and the lessee and sub-lessee entitled to the $5500 theretofore paid to each of them. The thirteenth appeal before us is from this judgment.

■■ In the absence of statutory regulation to the contrary, eminent domain proceedings may be abandoned by the condemnor at any time, even after judgment, so long as possession has not been taken or the award paid. Manion v. Louisville, St. L. & T. Ry. Co., 1890, 90 Ky. 491, 14 S.W. 532. Having once abandoned the action, however, the condemnor's right to proceed anew against the same property for the same purpose depends on whether the abandonment was in good faith. It cannot resort to "experimental suits and assessments" and in effect grant itself a new trial in order to have a reassessment without taking an appeal. 30 C.J.S. Eminent Domain § 340, p. 18; 18 Am.Jur. (1961 Supp.) 166, § 370.2. See also annotation, "Right to abandon and effect of abandonment of eminent domain proceedings," 121 A.L.R. 12.

■ We think there can hardly be any doubt that the old suits were completely abandoned and rendered ineffective by the orders entered in the circuit court at the instance of the state in March of 1958. The parties have wrangled over the question of whether these orders killed the entire proceedings or simply left the county court judgments in full force and effect. Cf. CR 72.04. Obviously, for example, a party appealing to the circuit court from a quarterly court judgment in an ordinary damage suit could not be permitted, on the ground that the case stands for trial de novo, to get rid of the adverse judgment by the simple device of dismissing in the circuit court. But whatever may be the proper effect of an appellant's dismissal in other types of actions, an eminent domain case is necessarily in a distinct category of its own by virtue of the condemnor's right to abandon. Since that right may be exercised at any stage of

the litigation, it is our opinion that an order in the circuit court reciting the fact of abandonment definitely extinguishes the entire proceeding. Therefore, the ruling of the circuit court in the new suits requiring or permitting the state to pay the amounts awarded in the old suits was in error, because the old suits were dead and no one was "bound" by them. And this is true regardless of whether the state acted in good faith in abandoning the old suits. The element of good faith is relevant only to the question of whether the state had a right to maintain the new proceedings. It has no bearing on the efficacy of the abandonment.

■ It is our further opinion that an abandonment may be effected without a formal order in the proceedings. "Like any other fact, abandonment may be shown by circumstances or by the actions, conduct, or declarations of the parties." Rice v. Rice, 1932, 243 Ky. 837, 50 S.W.2d 26, 30. This princple applies to the abandonment of condemnation proceedings. 30 C.J.S. Eminent Domain, § 336, p. 12. The official order promulgated by the Commissioner of Highways on March 6, 1958, was an express and conclusive abandonment, and if the shoe were on the other foot we should have no hesitation in holding that the state could not thereafter have taken any of the property under the old judgments. As it was not "bound" by those judgments, neither did it then have any rights under them. Thus the Tabor and Standard Oil cases, in which the record suggests that the state's appeals to the circuit court in the old suits may have been dismissed on technical grounds, prior to the abandonment, stand on the same footing as the other cases, in which the old suits were dismissed by orders specifically reciting the fact of abandonment.

■ What we have said thus far spells the answer in the Parsons-Johnson case, the thirteenth appeal mentioned above, in which a lessee and sub-lessee were adjudged recovery of $5500 each on the basis of the commissioners' award and county

court judgment in one of the old suits. Since the abandonment nullified any rights and obligations that may theretofore have vested by virtue of the old suit, their complaint for an injunction should have been tried on the issues raised by the state's answer. One of these was the question of whether the lessee was a month-to-month tenant. If so, the state, having succeeded to the title of the landlord, had the right to terminate the tenancy on a month's notice. Pack v. Feuchtenberger, 1930, 232 Ky. 267, 22 S.W.2d 914. Under no circumstances, of course, does a lessee's "loss of business" through condemnation of the leasehold constitute a proper item of recovery. The compensable loss of a tenant is the amount by which the fair value of the unexpired term of his lease exceeds the rent reserved for the same period. City of Ashland v. Kittle, Ky.1961, 347 S.W.2d 522, 524; City of Ashland v. Price, Ky.1958, 318 S.W.2d 861, 863. Therefore, if upon remand of the case the complaint is amended to seek recovery for the taking, damages should be limited to that amount. The state will be entitled to remittance of the $11,000 less the damages (if any) so recovered.

■ We come now to the dismissal of the new suits on the basis of the factual finding that the state had not acted in good faith in abandoning the old suits. We are bound by the finding of fact unless it was clearly erroneous. CR 52.01.

■ The essence of the bad faith contention is that the state never really intended to relocate the course of the road, and that its ulterior purpose in issuing the official order of abandonment was merely to postpone the project pending further negotiations with the property owners and a softening of their attitudes. The burden of proving this was on the condemnees, since it was they who had asserted it as an affirmative defense. We have concluded that their evidence did not substantially support the burden, and that the finding of bad faith was clearly erroneous.

■ "Good faith" is, of course, strictly a matter of intention as of the time the action in question was taken. In this case the man whose state of mind at the time of the abandonment is under scrutiny is Dr. James W. Martin, then Commissioner of Highways. On its face his official order of March 6, 1958, fairly construed, purported to be unconditional and permanent. In his testimony, given at a time when he had returned to his former career as an educator and an eminent member of the faculty at the University of Kentucky, he categorically stated that in signing the order he had intended an absolute abandonment and not a postponement.

■ We think that the official actions of a state officer at cabinet level, especially when coupled with his word under oath, must be given a strong presumption of good faith, rebuttable only by evidence of the most convincing weight and character. Naturally the rebutting evidence in such a case will be circumstantial, as it was in this case, but if the circumstances shown are equally consistent with either good faith or bad faith at the time of the official action, our opinion is that they are not enough to sustain a case of bad faith.

The salient circumstances leading up to and following the abandonment that are said to suggest, individually and collectively, that the state did not intend a permanent abandonment are as follows:

1. The project was promised to the people of Olive Hill by the Governor during his 1955 campaign for office. Hon. Bert Kiser, of Olive Hill, later served for a time as Deputy Highway Commissioner under Dr. Martin's predecessor and presumably retained influence in the state administration at the time of the abandonment. Hence it is argued that the policy of the state rested in the Governor, leading to the inference that he caused the project to be turned off and on like a faucet, without any actual change of purpose. The fact is, however, that even as late as August of 1958, when Commissioner Oates discussed

the situation with him, Governor Chandler very properly took the position that although he would like to build the road through Olive Hill he could not permit the state to be robbed in order to do it. We find in these circumstances nothing but the merest of speculation to indicate any concealed policy contrary to the expressed abandonment.

2. For some months prior to the order of abandonment, and on the virtual eve of its issuance, the highway department and its commissioner were in fact seriously considering a postponement rather than an abandonment. A press release of February 28, 1959, correctly quoted Dr. Martin thus: "Martin said 'we are postponing indefinitely any work' on the project. Meantime, he said, departmental officials hoped some way might be found to compose some of the differences to enable the state to acquire the needed right of way on a 'reasonable' basis * * *. 'If the Olive Hill people at some future time, and before an alternative plan is definitely worked out, decide they want U.S. 60 modernized through the city to the extent that they are willing to provide remaining right of way on terms in line with those which their neighbors have accepted as fair, then the Department will consider reinstatement of the project * * *. [In] the hope that the people of Olive Hill at some future time may become more interested in highways than they are now, the state will retain the right of way property it has already acquired.' "

We quote Dr. Martin's explanation as follows:

A— "We did consider dropping the project for the time being and going ahead with other construction and simply forgetting Olive Hill for the moment. However, after a series of conferences with the Division of Right of Way and the legal staff, the United States Bureau of Public Roads District Engineers and General Engineering staff of Public Highways, I determined the project should be completely aban-

doned running through the downtown area of Olive Hill and a way found around the town so the road could be constructed in such a manner as to relieve the traffic bottleneck in Olive Hill but without incurring the right of way cost we felt assured of if we went through the downtown area."

Q— "You meant it then, when you issued this order—you had made up your mind to finally abandon it—is that correct?"

A— "That is correct."

With specific reference to the newspaper article he said this:

"Well, at the time that was announced, as I indicated earlier, by intention at least we were still debating the policy that we would follow, and if I remember correctly, we used 'abandon' and we used 'postpone'. At that time it didn't seem to make much difference as we were still debating the question. It seemed to be all right until we reached a judgment as to whether we were talking about postponement or abandonment. Our decision was reflected in our final order."

It is our opinion that the consideration and discussion of a postponement, while deliberations were still in the tentative stage short of formal decision, is no indication of bad faith in the ultimate determination to abandon.

3. Relocating the highway around Olive Hill would possibly have caused the loss of $249,000 already paid for what were stipulated as constituting highway "easements" (as distinguished from corporeal title) acquired along the route through the town. Again, however, we refer to the explanation given by Dr. Martin:

Q— "Just before the order was issued, did you advise with the legal counsel with respect as to whether or not the Commonwealth of Kentucky would stand to lose money on the prop-

erty already negotiated for and already owned on part of the project to be abandoned?"

A— "I was advised that any loss from that source, or for that reason, would in all probability be negligible."

Q— "Did they tell you in what way?"

A— "Yes, sir. I'm not lawyer enough to be sure I understood, but there was some sort of legal principle adverse to—enrichment which would enable the Commonwealth to recover according to the advice I was given at the time."

and to the testimony of the right-of-way director:

Q— "You understood that the State would simply lose the amount of money they paid for those pieces of property if they adopted the alternate route?"

A— "No. I never understood that; the lawyer said here that was not the case; that the money would not be lost."

 Certainly it was not a foregone conclusion to the department at the time (nor is it to us at the present time) that under these unusual circumstances the state would lose the $249,000 it had paid for the easements or, for that matter, that it would lose the easements. In any event, the risk was within the discretion of the commissioner, and its existence does not impugn the authenticity of his decision to court it.

4. It was never satisfactorily shown that the new survey directed by the abandonment order was made, although Dr. Martin did testify as follows:

Q— "Was there any survey made on any alternate route?"

A— "There was a survey reported on, and I presume it was made otherwise they couldn't have reported it.

The engineering staff brought in a map showing an alternate way of getting around Olive Hill on the north side of the town."

Q— "Had that been made some years previously?"

A— "I can't answer that; I don't know when it was made. About the time the Olive Hill people came in to urge that the project through the city be resumed, the engineering staff at my request brought in the drawing and explained the terrain and estimates of the cost."

Again, this circumstance is entirely consistent with a bona fide intention to abandon *as of the time of the order*. It is to be expected that such an order would be followed by pressure to reinstate the project, and in the world of government and politics it is an absolute requisite to lend a respectful and serious ear to any supplication of the citizenry. Assuming its good faith at the time of the order, the department not only had a right to change its mind but was morally obliged to do so if conditions ameliorated to the point that it was in the best interest of the public. The immediate response from Olive Hill was enough to justify the department's marking time on the alternative routing pending further developments that appeared to be in progress. The state ought not to be penalized on account of the department's willingness to reconsider its action.

5. In letters written during April of 1958 Dr. Martin acknowledged that a restoration of the project was possible, depending on a change in local attitudes with respect to fair values. Later on his successor, Commissioner Oates, worked actively to promote a favorable atmosphere for reinstatement, and sent his right-of-way director to Olive Hill for further negotiations which resulted in tentative settlements with the owners of all but about eight of the remaining parcels. The negotiated prices for 12 parcels were supported by new appraisals and exceeded the original commis-

sioners' awards by some $15,000. It was at this stage that the commissioner determined to reactivate the project.

The foregoing facts fall in the same evidentiary category as the department's alleged failure to follow through with a new survey. They manifest nothing more than a conciliatory response by the highway department to the efforts of the mayor and other interested people of Olive Hill to bring about a reconsideration. A significant circumstance in this respect is that those efforts were initated by citizens and officials of Olive Hill, and not by the state. There is no evidence that any representative of the state, following the abandonment, took any action or made any statement indicating a possible reinstatement until after inquiries in that regard had been received from persons desiring such a change.

6. The order in question declared the project to be abandoned "without prejudice" and specifically excluded "the right of way already acquired and paid for."

■ "Without prejudice" is an expression familiar in legal terminology. When an action is dismissed without prejudice we take it as being noncommittal with respect to future action. When orders have. been entered which might otherwise be binding it is a precautionary device to prevent that possibility. In the instant case the state had prosecuted a group of cases through judgment in the county court and one of them to the point of a jury verdict in circuit court. Therefore, its abandonment of the project "without prejudice" had a good and sufficient purpose if only to serve as protection against the very thing that should not have happened, but did happen, when both the county and circuit courts at a later date said it was "bound" by the old judgments and verdict. Our opinion is that the use of the expression "without prejudice" in the abandonment order did not evince any equivocation of purpose.

As to retention of the rights theretofore acquired and paid for, what we have already said in item 3 of this enumeration is sufficiently explanatory of the state's position regarding the $249,000 it had invested in rights-of-way along the abandoned route. The department's legal advice was to the effect that this money was largely recoverable. It would have been improvident to release the easements summarily and without an effort to secure reimbursement. Retention of its rights until it was able to determine what could be done to salvage this large investment was not an indication that the state intended to come back and build the road there later.

When all of the proof in the case is carefully analyzed it cannot be fairly said that any of it is inconsistent with the state's claim of a good faith intention, at the time its order was entered on March 6, 1958, to abandon the route through Olive Hill and relocate it around the town. Therefore, it is our opinion that the finding of fact to the contrary was clearly erroneous. The state is entitled to maintain the new proceedings and, pending final judgments fixing the awards, the property owners should be ordered to remit the respective amounts received in excess of the commissioners' awards in the new suits.

The effect of a "bad faith" abandonment would have been to forfeit the state's power of eminent domain and prevent construction of the highway along the original route through the town at any time in the foreseeable future unless the right-of-way acquisition could be completed by agreement with the holdout owners. We recognize that the circuit court, in adopting the theory that the awards made in the old suits were still in effect, probably sought a reasonable middle ground through which the state could escape this dilemma. Its close brush with disaster in these cases illustrates the desirability of legislation making the reinstatement or renewal of condemnation proceedings subject to a waiting period rather than a state of mind at the time of abandonment or dismissal.

The orders of February 19, 1960, over-ruling the state's motion to redocket the old cases theretofore dismissed in March of 1958 should be modified by deletion of the recitations to the effect that the state is bound by the judgments (or, in the Mc-Glone case, the verdict) in the initial proceedings and that the legal effect of the dismissals was to dismiss the appeals rather than the actions. So modified, the orders of February 19, 1960, in the six "old" cases are affirmed, with costs of the appeals to be divided equally between the appellant and appellees.

The judgments of December 11, 1959, in the six "new" cases and the judgment of December 18, 1959, in the Parsons-Johnson case are reversed and the respective causes remanded for further proceedings consistent with this opinion, with costs of the appeals to be taxed to the appellees.