733 A.2d 580 (1999)
323 N.J. Super. 505
ESSEX COUNTY IMPROVEMENT AUTHORITY, Plaintiff,
v.
RAR DEVELOPMENT ASSOCIATES, Palmer Industries, Inc., Passaic Valley Sewerage Commissioners, The City of Newark, Bell Atlantic of New Jersey and Public Service Electric and Gas Co., Defendants.
Superior Court of New Jersey, Law Division, Essex County.
Decided April 1, 1999.
*582 J.S. Cohen, for plaintiff Essex County Improvement Authority (DeCotiis, Fitzpatrick & Gluck, LLP, Ramsey).
Anthony F. Della Pelle, for defendant RAR Development Associates (McKirdy & Riskin, Morristown).
Spencer B. Robbins, New York City, for defendant Palmer Industries, Inc. (Robbins and Robbins).
William A. Fox, Morristown, for defendant Passaic Valley Sewerage Commissioners (Graham, Curtin & Sheridan, PA).
Ellen M. Harris, Newark, for defendant City of Newark (City of Newark Corporation Counsel).
Kenneth D. Wolfe, Atlantic City, for defendant Bell Atlantic of New Jersey (Cooper, Perskie, April, Niedelman, Wagenheim & Levenson).
Carl L. Sulzberger, Newark, for defendant Public Service Electric and Gas, Co. (Public Service Electric & Gas, Co., attorney).
*581 WEISS, A.J.S.C.
I. Background
This matter is before the court on the return date of an Order to Show Cause as to why final judgment should not be entered that the plaintiff, Essex County Improvement Authority ("ECIA"), has duly exercised its power of eminent domain and, therefore, three disinterested commissioners should be appointed to determine the compensation to the defendant, RAR Development Associates ("RAR"), for the taking of its property interest.
On November 20, 1998, a Verified Complaint, a Declaration of Taking and a Lis Pendens was filed by ECIA and an Order to Show Cause was entered by the court. An Order for Payment and Possession was signed by the court on December 1, 1998.
II. Facts
In 1996, the City of Newark agreed to allow the County of Essex to construct a jail in Newark on the condition that the County also construct a minor league baseball stadium and a soccer stadium on county land located in Newark. The County of Essex agreed to use Riverbank Park as the county property on which to build the baseball and soccer stadiums. In addition, the County agreed to construct a replacement park near Riverbank Park. In return, the City of Newark agreed to provide fifty percent of the funding needed to build the stadiums and fifty percent of the funding needed to obtain and construct the replacement park. This venture became known as the "Sportsplex Project."
Under the terms of the agreement between the County of Essex and City of Newark, ECIA was to assume the task of initiating the necessary steps for the development of the jail, the stadiums and the replacement park. On October 16, 1996, the Essex County Freeholders adopted Resolution No. R-96-0565 entitled "Resolution Amending Resolution No. R96-0363." Resolution No. R-96-0565 identified defendant RAR's property as the site for the replacement park and authorized ECIA to condemn the property.
ECIA had RAR's property appraised and investigated for environmental purposes. This process continued into 1997, with one appraisal issued in March 1997 and another in July 1997. Soon thereafter, ECIA made two written offers to RAR for the acquisition of its property. After having made these offers, ECIA learned of environmental contamination at Riverbank Park. As a result, ECIA determined that it would be unsuitable to construct the baseball and soccer stadiums at Riverbank Park and decided to search for a new location. Furthermore, ECIA decided that it would only build the baseball stadium *583 at the new site, instead of both the baseball and soccer stadiums as initially planned.
After ECIA concluded not to build the baseball and soccer stadiums at Riverbank Park and no longer needed to acquire RAR's property for the construction of the replacement park, Mr. Thomas A. Banker, the Executive Director of ECIA, contacted Mr. Gerald Rubin, the general partner of RAR, by telephone. During the telephone conversation which took place shortly after the July 14, 1997 offer to purchase RAR's property, Mr. Banker informed Mr. Rubin that Riverbank Park would not be used as the site for the Sportsplex Project because of the environmental contamination found at the location. Mr. Banker also told Mr. Rubin that ECIA was in search of a new site for the Sportsplex Project and since Riverbank Park was not going be used as the site for the baseball stadium, RAR's premises was no longer needed as a replacement park. Thus, ECIA was withdrawing its offer to purchase RAR's property.
Plaintiff's decision to withdraw the offer to purchase RAR's property and to abandon the condemnation action against RAR for the taking of its property was confirmed by an October 1, 1997 letter sent to Mr. Rubin by Mr. Banker. The letter specifically stated:
Please be advised that the Essex County Improvement Authority ("ECIA") has determined that it is no longer necessary to acquire the property described above, for which you are the record owner, by negotiated sale or eminent domain. By letter dated July 14, 1997, you were extended an offer to purchase the subject property for the amount of $995.000. The ECIA hereby withdraws that offer and provides you with notice of the abandonment of its intention to acquire this property by eminent domain. ("emphasis added")
After investigating other alternatives, it was decided to construct the baseball stadium on Bridge Street, the new site for the Sportsplex Project. On January 5, 1998, Mr. Banker sent a letter to Mr. Glenn Grant, the Business Administrator of the City of Newark, explaining:
Since Riverbank Park will not be used for the project, there would be no need to build a replacement park, which would therefore be deauthorized.
As a result of the change in location for the stadium, the County of Essex and the City of Newark agreed to amend the original $22,000,000 bond that was issued for the construction of the stadium to reflect the new site on Bridge Street. On January 7, 1998, the Essex County Freeholders adopted Resolution No. R-98-006, which approved the change in the stadium location to Bridge Street, ratified the amendment of the bonds and authorized ECIA to obtain the property located on Bridge Street by eminent domain for the purpose of building the baseball stadium. The language of Resolution No. R-98-006 specifically stated that "there is no longer a need for the Authority to ground lease Riverbank Park from the County pursuant to the terms of that certain "Ground Lease Agreement (Sportsplex Project)" dated as of July 1, 1997 (the "Ground Lease") by the County, as lessor, and the Authority, as leasee."
On January 27, 1998, several resolutions were passed by the Essex County Freeholders. Resolution No. R-98-015 stated that since the location of the baseball stadium had been changed from Riverbank Park, there no longer was the need to acquire RAR's property.
. . . . .
WHEREAS, the proceeds of the Initial Bonds were originally earmarked to finance (iii) the planning, design, acquisition, construction, installation and renovation of a park (the "Recreational Area") to consist of courts, fields and playgrounds for general recreational purposes at a site (as more particularly described in Exhibit A to the hereinafter defined Original County Lease, the *584 "Recreational Project Property;" the Recreational Area and the Recreational Project Property shall be collectively referred to as the "Recreational Project") to be acquired by the Authority on behalf of the County as a replacement for Riverbank Park.
. . . . .
WHEREAS, because the Authority, the County and the City have previously agreed to change the location of the baseball facility away from Riverbank Park, there was no longer a need for the Authority to (I) ground lease Riverbank Park from the County pursuant to the terms of that certain "Ground Lease Agreement (Sportsplex Project)" dated as of July 1, 1997 (the "Ground Lease") by the County, as lessor, and the Authority, as leasee, and there is no longer a need for the Authority to (ii) acquire the Recreational Project Property needed to construct the Recreational Area and (iii) construct the Recreational Project. ("emphasis added")
. . . . .
Resolution No. R-98-016, also passed on January 27, 1998, contained identical language, stating:
. . . . .
WHEREAS, because the Authority, the County and the City have previously agreed to change the location of the baseball facility away from Riverbank Park, there was no longer a need for the Authority to (I) ground lease Riverbank Park from the County pursuant to the terms of that certain "Ground Lease Agreement (Sportsplex Project)" dated as of July 1, 1997 (the "Ground Lease") by the County, as lessor, and the Authority, as leasee, and there is no longer a need for the Authority to (ii) acquire the Recreational Project Property needed to construct the Recreational Area and (iii) construct the Recreational Project. ("emphasis added")
. . . . .
Since the passage of these resolutions, the County of Essex has not reauthorized the condemnation of RAR's property for use as a replacement park.
ECIA contends that there has not been an abandonment of the condemnation of RAR's property and refers to the shorthand identifiers in the "Whereas" clauses of the resolutions as evidence that the condemnation of RAR's property remained viable.
III. Legal Analysis
Under the U.S. and New Jersey Constitutions, a government body is permitted to take private property for public use in exchange for just compensation. U.S. Const., Am. XIV; N.J. Const., Art. I, par. 20. See also Abbott v. Beth Israel Cemetery Ass'n of Woodbridge, 13 N.J. 528, 100 A.2d 532 (1953); Spiegle v. Borough of Beach Haven, 46 N.J. 479, 218 A.2d 129 (1966), cert. denied 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966); State v. South Hackensack Tp., 65 N.J. 377, 322 A.2d 818 (1974); Kessler v. Tarrats, 194 N.J.Super. 136, 476 A.2d 326 (App.Div.1984); Ryan v. Housing Authority of Newark, 125 N.J.L. 336, 15 A.2d 647 (Sup.Ct.1940); Valentine v. Lamont, 25 N.J.Super. 342, 96 A.2d 417 (App.Div.1953); Borough of Essex Fells v. Kessler Institute for Rehab., 289 N.J.Super. 329, 673 A.2d 856 (1995).
Although the power of eminent domain is held exclusively in the legislative branch of the government, various state agencies have been given the authority by the State Legislature to condemn private property for just compensation because it is not feasible for the Legislature to directly oversee all condemnation actions. N.J.S.A. 20:3-1, et seq.; Wes Outdoor Advertising Co. v. Goldberg, 55 N.J. 347, 351, 262 A.2d 199 (1970); Borough of Essex Fells v. Kessler Institute for Rehab., 289 N.J.Super. 329, 336, 673 A.2d 856 (1995).
*585 In addition, New Jersey courts have given condemning authorities great discretion in deciding what property may be taken for public purpose because the courts realize that it is the function of the Legislature to determine "public purpose." Burnett v. Abbott, 14 N.J. 291, 294, 102 A.2d 16 (1954); Kessler Institute for Rehab., supra, at 337, 673 A.2d 856, citing State v. Lanza, 27 N.J. 516, 530, 143 A.2d 571 (1958), app. dism. 358 U.S. 333, 79 S.Ct. 351, 3 L.Ed.2d 350 (1959). Absent a showing of "improper motives, bad faith or some other consideration amounting to a manifest abuse of the power of eminent domain," the courts will not interfere with the public body's decision to condemn private property. Tennessee Gas Transmission Company v. Hirschfield, 39 N.J.Super. 286, 288, 120 A.2d 886 (App.Div.1956); City of Newark v. New Jersey Turnpike Authority, 7 N.J. 377, 81 A.2d 705 (1951); Town of Bloomfield v. New Jersey Highway Authority, 18 N.J. 237, 113 A.2d 658 (1955); Faubel v. Buckeye Pipe Line Co., 20 N.J.Super. 116, 120, 89 A.2d 286 (Law Div.1952); City of Trenton v. Lenzner, 16 N.J. 465, 109 A.2d 409 (1954); Bergen County v. S. Goldberg & Co., Inc., 76 N.J.Super. 524, 185 A.2d 38 (App.Div. 1962); New Jersey Highway Auth. v. Currie, 35 N.J.Super. 525, 114 A.2d 587 (App. Div.1955); State of New Jersey State Highway Commissioner v. Buck, 94 N.J.Super. 84, 226 A.2d 840 (1967). Kessler Institute for Rehab., supra, at 337, 673 A.2d 856. There will be no judicial scrutiny of the government's decision to use its eminent domain power unless there is evidence demonstrating that the decision to condemn was made in bad faith or through fraud. In re East Windsor Mun. Util. Auth. v. Shapiro, 57 N.J. 168, 270 A.2d 410 (1970), cert. denied 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971); State of New Jersey, By Commissioner of Transportation v. Malibu Beach, Inc., 209 N.J.Super. 291, 507 A.2d 316 (1986).
Bad faith is referred to as the doing of an act for a dishonest purpose. The term also "contemplates a state of mind affirmatively operating with a furtive design or some motive of interest or ill will." Borough of Essex Fells v. Kessler Institute for Rehab., 289 N.J.Super. 329, 338, 673 A.2d 856 (1995), citing Lustrelon Inc. v. Prutscher, 178 N.J.Super. 128, 144, 428 A.2d 518 (App.Div.1981). The party making the claim that the government has conducted itself in bad faith or in a fraudulent manner has the burden of proof. Texas East. Trans. Corp. v. Wildlife Preserves, Inc., 48 N.J. 261, 225 A.2d 130 (1966); Essex County v. Hindenlang, 35 N.J.Super. 479, 114 A.2d 461 (App.Div. 1955); State v. Totowa Lum. & Sup. Co., 96 N.J.Super. 115, 232 A.2d 655 (App.Div. 1967). Furthermore, evidence showing that the government acted in bad faith must be clear and convincing. Klump v. Cybulski, 274 Wis. 604, 81 N.W.2d 42, 47 (1957). Only then will the condemnation be set aside.
Although the defendant has raised numerous arguments as to why ECIA should not be granted the relief requested, the court need only deal with the question of "abandonment." Under N.J.S.A. 20:3-35, the condemning authority has the option to abandon the condemnation proceeding prior to the actual taking. The statute provides two methods of effectuating abandonment; one unilaterally and one by mutual consent:
Any action hereunder may be abandoned at any time before or within 30 days after the filing of the award of commissioners; or in the event of an appeal from such award, at any time before or within 30 days after the entry of judgment; or in the event that a hearing before commissioners shall have been waived, at any time before or within 30 days after judgment has been entered in said action; provided, however, that no such action shall be abandoned after the filing of a declaration of taking pursuant to Article V hereof, or after the vesting of title in any condemnor pursuant hereto; and provided further, *586 that (a) a discharge of the notice of lis pendens is filed, and (b) the condemnor shall pay the expenses of all condemnees who have appeared in the action. Nothing herein shall preclude abandonment at any time by mutual consent of the parties.
[N.J.S.A. 20:3-35]
New Jersey's public policy, as consistent with the public policy of various other states, is to give the government an opportunity to receive a fair estimation of the land it wishes to acquire before making the final decision to take the privately owned property. The rationale is that the government may later determine that it is not in the public's best interest to purchase the property for the estimated fair market value. Since title does not vest in the condemning authority until after the compensation is rendered to the landowner, the government is given the option to unilaterally abandon the condemnation action prior to the vesting of the title. Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939); Mabon v. Halsted, 39 N.J.L. 640 (Sup.Ct.1877), citing In re Water Commissioners of Jersey City, 31 N.J.L. 72 (Sup.Ct.1864); City of Englewood v. Veith Realty Co. & City of Englewood v. McQuillin, 50 N.J.Super. 369, 142 A.2d 663 (1958); State ex rel. Morrison v. Helm, 86 Ariz. 275, 345 P.2d 202 (1959), citing Manion v. Louisville. St. L. & T. Ry. Co, 90 Ky. 491, 14 S.W. 532 (1890); Oklahoma Turnpike Authority v. Dye, 208 Okl. 396, 256 P.2d 438 (1953); State ex rel. Struntz v. Spokane County, 85 Wash. 187, 147 P. 879 (1915); Selle v. City of Fayetteville, 207 Ark. 966, 184 S.W.2d 58 (1945); State v. Calkins, 54 Wash.2d 521, 342 P.2d 620 (1959); Department of Public Works and Buildings v. O'Brien, 402 Ill. 89, 83 N.E.2d 280 (1948); State v. Flamme, 217 Ind. 149, 26 N.E.2d 917 (1940); De Penning v. Iowa Power & Light Co., 239 Iowa 950, 33 N.W.2d 503 (1948).
In this case, the option of unilaterally abandoning the condemnation proceedings under N.J.S.A. 20:3-35 is unavailable because ECIA filed a declaration of taking on November 20, 1998, which under the statute eliminates unilateral abandonment by the condemnor. Alternatively, the statute permits the abandonment of the condemnation proceeding by mutual consent of the parties. There are no cases in New Jersey which have construed this section of the statute. Abandonment has been defined as having two elements: the intent to abandon and the performance of an external act giving effect to the intent. City of Los Angeles v. Abbott, 129 Cal.App. 144, 18 P.2d 785 (1933); Sanders et ux. v. Portland & O.C. Ry. Co., 98 Or. 620, 193 P. 660 (1920). The condemnation may be abandoned by the passage of a resolution or the repeal of the initial ordinance that permitted the commencement of the condemnation action. Wheatley v. City of Fairfield, 221 Iowa 66, 264 N.W. 906 (1936); Wagner v. James A. Bealmear & Son Co., 135 Md. 690, 109 A. 466 (1920) (condemnation was held abandoned when the city passed a resolution to abandon the condemnation), citing Robertson v. Hartenbower, 120 Iowa 410, 94 N.W. 857 (1903). The actions, conduct or declarations of the parties may demonstrate the intent needed to establish abandonment. Rice v. Rice, 243 Ky. 837, 50 S.W.2d 26, 29 (1932) (letter and absence of possession by leaseholder was held as abandonment).
In addition, the external act must be voluntary. The condemning authority must voluntarily surrender its right of eminent domain. In County of Kern v. Phil Galatas, 19 Cal.Rptr. 348, 200 Cal.App.2d 353 (1962), the court held that "when plaintiff omitted from the amended complaint any claim to oil, gas and mineral rights, there was an "intentional relinquishment of a known right." Furthermore, it was a "voluntary relinquishment" accomplished by plaintiff with an "intention to abandon" and evidenced by the "external act" of filing the amended complaint." Id. at 357, citing Abbott, supra, at 148, 18 P.2d 785. See also Alta Bates Hospital v. Florence I. Mertle, 107 Cal.Rptr. 277, 31 Cal.App.3d *587 349 (1973) (failure of hospital to appeal the dismissal judgment was held as an implied, voluntary abandonment because the condemnor had a responsibility to prosecute the condemnation action to its completion); Torrance Unified School District of Los Angeles County v. Hilario S. Alwag, 145 Cal.App.2d 596, 302 P.2d 881 (1956) (dismissal by condemning authority after due deliberation of the profitability in the condemnation action was held as a voluntary act of abandonment).
The state of mind of the abandoning party is essential in establishing whether the abandonment was in fact made in good faith. The condemning body's state of mind can be determined from the actions and testimony of governmental officials. Commonwealth of Kentucky, Dept. of Highways v. Fultz, 360 S.W.2d 216, 222 (1962). In addition, the abandonment "may be effected without a formal order in the proceedings. `Like any other fact, abandonment may be shown by circumstances or by the actions, conduct, or declarations of the parties.'" Fultz, supra, at 221, citing Rice v. Rice, 243 Ky. 837, 50 S.W.2d 26 (1932).
These cases illustrate that the abandonment of the condemnation may be either express or implied. As long as there is the intent to abandon and the performance of an external, voluntary act giving effect to that intent in good faith, there is abandonment. In the present case, the facts support the conclusion that there was an abandonment of the condemnation by ECIA. After discovering the environmental contamination at Riverbank Park, ECIA concluded that it would not be using the Riverbank Park site for the stadiums and, therefore, there no longer was the need to acquire RAR's property for the purpose of constructing the replacement park. Accordingly, Mr. Thomas A. Banker, the Executive Director of ECIA, sent Mr. Gerald Rubin, the general partner of RAR, a letter dated October 1, 1997, stating "Please be advised that the Essex County Improvement Authority ("ECIA") has determined that it is no longer necessary to acquire the property described above, for which you are the record owner, by negotiated sale or eminent domain ... The ECIA hereby withdraws that offer [July 14, 1997] and provides you with notice of the abandonment of its intention to acquire this property by eminent domain" ("emphasis added"). The language of this letter clearly depicts ECIA's state of mind as to its intent to abandon. The language is not ambiguous or vague. On the contrary, the content is clear and demonstrates ECIA's voluntary relinquishment of its right to eminent domain. The fact that the letter was written by an authoritative person, such as the Executive Director of ECIA, further establishes the condemning authority's true intent to abandon.
In addition, the fact that RAR remained silent after receiving the letter from ECIA is evidence of RAR's acquiescence by silence to the abandonment of the condemnation action. The conduct of a party may infer acceptance when the circumstances are such that an ordinary reasonable person would be under a duty to speak if the terms of the proposal were not acceptable. Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 539, 95 A.2d 391 (1953). In Weichert Co. Realtors v. Thomas W. Ryan, 128 N.J. 427, 608 A.2d 280 (1992), the court held that assent may be evidenced by an express contract or by the conduct of the parties, creating an implied-in-fact contract. The court explained:
An offeree may manifest assent to the terms of an offer through words, creating an express contract, or by conduct, creating a contract implied-in-fact. See Restatement (Second) of Contracts Sec. 19(1) (1981). Silence does not ordinarily manifest assent, but the relationships between the parties or other circumstances may justify the offeror's expecting a reply and, therefore, assuming that silence indicates assent to the proposal.
[Id. at 436, 608 A.2d 280]
*588 See also Gomez v. Federal Stevedoring Co., Inc. 5 N.J.Super. 100, 68 A.2d 482 (1949). The court stated:
Although assent must be manifested in order to be legally effective, it need not be expressed in words. Modern law rightly construes both acts and words as having the meaning which a reasonable person present would put upon them in view of the surrounding circumstances. 1 Williston, Contracts, Section 22A (Rev.Ed.1938). Cf. Raiche v. Standard Oil Co., 137 F.2d 446 (C.C.A. 8th, 1943); Standard Oil Co. v. Lyons, 130 F.2d 965 (C.C.A. 8th, 1942); Daggett v. Kansas City Structural Steel Co. (Mo.Sup.Ct. 1933), 334 Mo. 207, 65 S.W.2d 1036. A hiring contract does not require formality. Cf. Essbee Amusement Corp. v. Greenhaus, 114 N.J.L. 492, 177 A. 562 (Sup.Ct.1935). It may be accomplished with words, or may be implied from conduct without words. Pfister v. Doon Electric Co., 199 Iowa 548, 202 N.W. 371.
[Id. at 103, 68 A.2d 482]
If RAR did not agree to the abandonment of the condemnation action by ECIA, it would have objected to the withdrawal of the offer to purchase its property and to the abandonment of the condemnation suit when it received Mr. Banker's October 1, 1997 letter. Instead, it asked about reimbursement for its expenses as permitted by N.J.S.A. 20:3-26(b).
Mr. Banker's letter to Mr. Glenn Grant, the Administrator of the City of Newark, approximately three months later, is further evidence of ECIA's abandonment of the condemnation of RAR's property. The January 5, 1998 letter specifically states, "Since Riverbank Park will not be used for the project, there would be no need to build a replacement park, which would therefore be deauthorized" ("emphasis added"). Again, the language of this letter unambiguously display's ECIA's state of mind, showing that there no longer was the need to build a replacement park because the Riverbank Park site was not going to be used for the Sportsplex Project.
In his presentation to the Essex County Board of Freeholders on January 7, 1998, Mr. Banker stated:
[G]iven that Riverbank Park would not be removed from service as a County Park, there would, therefore, be no direct correlation and need for there to be a replacement for Riverbank Park. So those two aspects of the original projectthe use of Riverbank Park and the creation of a replacementboth go away. Because Riverbank Park remains available for its original County purposes.
In addition to the ECIA's Executive Director's statement that the Riverbank Park and the creation of the replacement park were no longer part of the Sportsplex Project, he also said:
The only thing I would note is that thetheunder bond law and IRS regulations, until such time as the County designates, through the Ordinance process, a new project, technically, that money will remain appropriated for its original purpose, which was acquisition and development of a replacement park facility. So it will be sitting in that bucket, if you will, but no action would be taken until the County selects and authorizes the specific replacement projects. ("emphasis added")
If ECIA had not abandoned the condemnation of RAR's property, there would have been no need for the County's authorization for a specific replacement project, as is the case here. The shorthand identifiers in the "Whereas" clauses of the resolutions relied upon by ECIA as evidence of nonabandonment served the purpose of giving the County flexibility and the option to determine if it wanted to use part of the bond proceeds for a new replacement project.
The passage of Resolution No. R-98-006 on January 7, 1998 and Resolution No. R-98-015 and Resolution No. R-98-016 on *589 January 27, 1998 are formal acts which recognized ECIA's abandonment of the condemnation of RAR's property. The passage of these resolutions unequivocally articulated that the location of the baseball stadium had been changed from Riverbank Park to Bridge Street and, therefore, there no longer was the need to acquire RAR's property. Both Resolution No. R-98-015 and Resolution No. R-98-016 stated, "there is no longer a need for the Authority to (ii) acquire the Recreational Project Property needed to construct the Recreational Area and (iii) construct the Recreational Project."
The transcript from the Essex County Board of Freeholders' Meeting on February 4, 1998 demonstrates that the County did not reapprove the taking of RAR's property for a replacement park. On the contrary, the following dialogue between Freeholder Rolli and Freeholder Martinez proves that the County did not decide on any location for the new project.
Freeholder Rolli: So its's a new project beyond the scope of the Sportsplex.
Freeholder Martinez: Correct.
Freeholder Rolli: Okay. But this Ordinance deals with the bondingthe bonding mechanism for the Sportsplex.
Freeholder Martinez: Correct.
Freeholder Rolli: Andand following what Mr. Giantomasi [Freeholder Counsel] said, if theyif they decide on this new project, if what you say is correctand we haven't heard the Administrative proposing a new project tonightunless I missed it
Freeholder Martinez: That's right. No, they haven't.
Moreover, the transcript from the Essex County Board of Freeholders' Meeting on February 19, 1998 reveals the County acknowledging that it will have discussions with the City of Newark regarding a new agreement for a replacement park. The Freeholder President, Mr. DiVincenzo, specifically stated:
As far as the replacement park, that has to do with the pot of money that we're putting in, the 11 million and 11 million, the City is going to have a say and this Board is going to have a say about that replacement park. All right?
These transcripts cast away any doubt that the ECIA did not abandon the condemnation of RAR's property. Furthermore, the evidence clearly shows that ECIA never received County reauthorization to condemn RAR's property.
Having established that ECIA abandoned the condemnation of RAR's property for a replacement park, what of the filing requirement set forth in N.J.S.A. 20:3-36 will be addressed.
The abandonment shall be effected by filing and serving notice of abandonment.
[N.J.S.A. 20:3-36]
Although ECIA has served the notice of abandonment that has been agreed to by RAR, ECIA has not filed the notice of abandonment. The court believes that the mere technicality of not filing the notice should not prevent the abandonment from taking effect. Having mutually consented to the abandonment, it can be argued that the filing requirement is a ministerial act subject to Mandamus by the court.
In Essex County Mayors' Conference v. Board of Chosen Freeholders of the County of Essex, 124 N.J.Super. 393, 307 A.2d 131 (1973), the County Board of Chosen Freeholders had adopted a resolution, but did not file it with the County Clerk as required under N.J.S.A. 40:41A-1. The plaintiffs brought an action to compel the County to file the resolution, claiming that the act of filing the resolution was a ministerial act or duty. Id. The Freeholders argued that the filing requirement was "a separate, distinct acta decision which freeholders must make irrespective of, or in addition to, adopting the resolution." Id. at 399, 307 A.2d 131. In addition, the Freeholders contended that it was within *590 their discretion to decide whether to file the resolution and, if they choose not to file, the court did not have the authority to review their decision. Id. The court disagreed, holding that the intent to file did not require a separate intent and, therefore, ruled in favor of the plaintiffs. Id. at 401, 307 A.2d 131. "It is the opinion of this court that under N.J.S.A. 40:41A-1, once freeholders adopted the Rotundo resolution authorizing an election on the question of a charter study, the remaining act of filing the resolution with the county clerk became merely a ministerial act subject to Mandamus." Id. at 405, 307 A.2d 131.
Given the nature of the facts of this case and the evidence presented to the court, there will be a significant miscarriage of justice if the abandonment is not effectuated. To prevent this injustice from occurring, the use of the doctrine of estoppel in pais is appropriate. Many jurisdictions apply the doctrine of estoppel in pais to prevent fundamental injustice from taking place. The application of this doctrine cuts off the rights or privileges that a party may be granted by statute. Piz v. Housing Authority of the City & and County of Denver, 132 Colo. 457, 289 P.2d 905 (1955), citing Johnson et al. v. Neel, 123 Colo. 377, 229 P.2d 939 (1951), Kalloch v. Elward, 118 Me. 346, 108 A. 256 (1919), Wilson v. Philadelphia School District, 328 Pa. 225, 195 A. 90 (1937) and City of Colorado Springs v. Colorado City, 42 Colo. 75, 94 P. 316 (1908). Although the doctrine of estoppel is rarely used, it can be applied to protect citizens when it is in the interest of justice to do so. City of Los Angeles v. Kaspare Cohn et al., 101 Cal. 373, 35 P. 1002 (1894), citing Simplot v. Chicago etc. Ry. Co., 16 F. 350 (1883) and Crocker v. Collins, 37 S.C. 327, 15 S.E. 951 (1892). In particular, estoppel is warranted when "one whose conduct, silence or omission has induced another to action or nonaction may, `be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct.'" In re Allstate Insurance Company, 179 N.J.Super. 581, 593, 432 A.2d 1366 (App.Div.1981), citing Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 117 A.2d 585 (1955) and Feldman v. Urban Commercial, Inc., 70 N.J.Super. 463, 175 A.2d 683 (Ch. Div.1961). The use of the doctrine of estoppel in pais, however, must not be prejudicial to the functions of the government. In other words, although the application of estoppel may be justified to prevent the government from acting in an unjust manner, the use of estoppel must not impair the role of the government. Suburban Golf Club of Elizabeth v. State Highway Comm., 92 N.J.Super. 125, 222 A.2d 301 (1966). In Suburban Golf Club of Elizabeth, the court applied the estoppel doctrine and held that Suburban had legal title to the subject property and, therefore, the condemning authority had an obligation to pay Suburban just compensation for the taking of that property. Id. at 142, 222 A.2d 301. In applying estoppel, the court stated, "[T]here will be no impairment of the sovereign powers of the State, for its right to condemn in the present or future are not affected and there is no violation of public policy or welfarein fact, the policy expressed by the New Jersey Constitution and statutes is to the effect that the State should not take private property without just and reasonable compensation. N.J. Const., Art. I, par. 20; N.J.S.A. 20:1-1 et seq.; N.J.S.A. 27:7-22. An equitable estoppel is necessary to prevent loss to Suburban and a manifest injustice since the parties can in no other way, but by the payment of money, be placed In statu quo."Id. at 141, 222 A.2d 301. See also In re Allstate Insurance Company, supra, at 593, 432 A.2d 1366, citing Vogt v. Belmar, 14 N.J. 195, 101 A.2d 849 (1954), East Orange v. East Orange Bd. of Water Com'rs, 73 N.J.Super. 440, 180 A.2d 185 (1962) and Anske v. *591 Palisades Park, 139 N.J.Super. 342, 354 A.2d 87 (App.Div.1976).
These cases establish that the doctrine of estoppel in pais may be used against the government entity to prevent frustration of justice to the nongovernment party as long as the function of the government is not hindered by the application of the doctrine. In the present case, the facts warrant the use of the estoppel doctrine so as to prevent a fundamental miscarriage of justice to RAR: the taking of its property when the condemnation has been abandoned by ECIA. The evidence presented before the court is clear. ECIA abandoned the condemnation of RAR's property, gave RAR a written notice of its intent to abandon, notified the City of Newark that a replacement park was no longer necessary and passed several resolutions formally effectuating the intent to abandon.
RAR relied on the October 1, 1997 letter from Mr. Banker to Mr. Rubin, which specifically indicated ECIA's notice of intent to abandon and withdrawal of its July 14, 1997 offer to purchase RAR's property. During the months that followed, ECIA did not have any contact with RAR regarding the condemnation action. For approximately seven months. ECIA was silent on the issue of condemning RAR's property for use as a replacement park. RAR, therefore, rightfully relied on ECIA's silence to confirm the abandonment of the condemnation action. To now hold that the abandonment does not take effect simply because ECIA failed to meet the technicality of filing the notice of abandonment, as required under the New Jersey statute, would be severely unjust to RAR. The fact that ECIA possessed the intent to abandon and performed actions consistent with this intent compel the court to adopt the doctrine of estoppel in pais to prevent ECIA from declaring that the abandonment does not take effect because ECIA did not file the notice of abandonment. To do so otherwise would be a serious miscarriage of justice.
Furthermore, the application of the estoppel doctrine will not hinder the governmental function of ECIA because ECIA may still condemn private property for public use. The estoppel doctrine does not strip away ECIA's authority to condemn RAR's property, it merely prevents ECIA from escaping its already declared intent, consistent with its conduct, to abandon the taking of RAR's property for use as a replacement park. In other words, although ECIA will be prevented from claiming that there has not been an abandonment of the condemnation action against RAR, the doctrine of estoppel will not impair ECIA's ability to invoke its power of eminent domain against RAR in the future. ECIA, therefore, may proceed to bring another condemnation action against RAR, but since there has been an abandonment of the original condemnation proceeding, ECIA must proceed as though it were commencing a new condemnation action. In sum, ECIA must obtain County reapproval for the taking of RAR's property.
When there has been an abandonment of the condemnation action by the public body, the landowner is entitled to reasonable attorney fees. N.J.S.A. 20:3-26(b) provides:
If the court renders final judgment that the condemnor cannot acquire the real property by condemnation or, if the condemnation action is abandoned by the condemnor, then the court shall award the owner of any right, or title to, or interest in such real property, such sum as will reimburse such owner for his reasonable costs, disbursements and expenses actually incurred, including reasonable attorney, appraisal, and engineering fees.
New Jersey courts have held that the landowner is due reasonable costs, expenses and counsel fees when there has been an abandonment of the condemnation action by the condemning authority. Teaneck Tp., Bergen County v. Mercer, County Clerk, 124 N.J.L. 120, 11 A.2d 103 (1940). "The statutory right of the township to abandon the proceedings to condemn *592 is conditioned upon the payment of the reasonable costs, expenses and counsel fees." Id. at 122, 11 A.2d 103. See also City of Englewood v. Veith Realty Co.; City of Englewood v. McQuillin, 50 N.J.Super. 369, 142 A.2d 663 (1958). The trial court is to use its discretion in ascertaining the reasonable costs. Absent a showing that the trial court has abused its discretion in determining reasonable costs, there will be no judicial scrutiny of the court's determination. Texas Pipe Line Company v. Snelbaker, 33 N.J.Super. 11, 109 A.2d 287 (1954), citing Barr v. Borough of Belmar, 118 N.J.Eq. 279, 179 A. 31 (E. & A.1935).
Although the general rule of law in New Jersey is that the landowner is entitled to reasonable costs, expenses and counsel fees when there has been an abandonment of the condemnation action, there is an exception to the rule. In Kean v. Union County Park Commission, 130 N.J.Eq. 591, 22 A.2d 256 (E. & A.1941), the Court held that even though there had been an abandonment of the condemnation by the government, the condemnation had not progressed far enough for the landowner to receive reasonable costs. In explaining its rationale, the Court stated "Thus we find that the Legislature has given the condemning agency the right to abandon within twenty days after the filing of the commissioner's report or jury's verdict upon payment of reasonable costs, expenses and counsel fees. In the present case no commissioner's report has been filed nor jury's verdict rendered so that in no event would the Keans [landowners], in the present state of the matter, be entitled to costs." Id. at 593, 22 A.2d 256.
In the present case, although there has been an abandonment of the condemnation action by ECIA, RAR is not entitled to reasonable costs, expenses and counsel fees because the condemnation action has not progressed far enough to give RAR a right to these costs. No condemnation commissioners have been appointed. These proceedings are still in their preliminary stages.
IV. Summary
Based on the uncontradicted evidence presented to the court, it is clear that ECIA abandoned the condemnation action against RAR by sending RAR a written notice of abandonment, notifying the City of Newark that a replacement park was no longer necessary and passing several resolutions formally effectuating the abandonment. Given the merits of this case, the application of the doctrine of estoppel in pais is warranted to prevent ECIA from continuing to prosecute the present condemnation action against RAR. ECIA's Order to Show Cause, therefore, is denied and the condemnation of RAR's property is declared to be abandoned.