NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is only binding on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1651-14T4

COUNTY OF ESSEX,

 Plaintiff-Respondent/
 Cross-Appellant,

v.

GERALD RUBIN and THE GRACE
ARAMANDA TRUST,

 Defendants-Appellants/
 Cross-Respondents,

and

CHRISTIAN FEIGENSPAN & CO.;
ORATON INVESTMENT CO.; CITY
OF NEWARK; and NEW JERSEY
DEPARTMENT OF ENVIRONMENTAL
PROTECTION, BUREAU OF TIDELANDS
MANAGEMENT,

 Defendants.
____________________________________

 Submitted October 11, 2016 — Decided August 2, 2017

 Before Judges Sabatino, Nugent and Haas.

 On appeal from Superior Court of New Jersey,
 Law Division, Essex County, Docket No. L-981-
 10.

 Law Office of W. Lane Miller, and Paul V.
 Fernicola & Associates, LLC, attorneys for
 appellants/cross-respondents; Mr. Miller, of
 counsel; Mr. Miller and Robert Moore, on the
 briefs).

 DeCotiis, FitzPatrick & Cole, LLP, attorneys
 for respondent/cross-appellant; Mr. Frino, of
 counsel; Michael J. Ash, on the briefs).

PER CURIAM

 Plaintiff, County of Essex ("the County"), filed this

condemnation action under the Eminent Domain Act of 1971, N.J.S.A.

20:3-1 to -50 ("the Act") to acquire land owned by defendants

Gerald Rubin and the Grace Aramanda Trust ("the owners"). The Act

includes, among four possible dates for determining just

compensation to the owners, "the date possession of the property

being condemned is taken by the condemnor in whole or in part" and

"the date on which action is taken by the condemnor which

substantially affects the use and enjoyment of the property by the

condemnee." The trial court determined on summary judgment the

former was the appropriate valuation date.

 The owners appeal from the March 22, 2013 implementing order.

They also appeal from the trial court's May 6, 2013 order that

denied their motion for reconsideration, and from the October 23,

2014 order that entered final judgment on the jury's valuation

verdict.

 The County cross-appeals from the order of judgment, arguing

the trial court improperly permitted the owners' expert to include

 2 A-1651-14T4
part of a vacated street in his valuation of the condemned land.

The County also contends the trial court twice erred during the

trial; first, when it precluded plaintiff's expert from testifying

about the motivation of a buyer for buying comparable property;

second, when it refused to instruct the jury that the condemned

property was subject to regulation by the New Jersey Department

of Environmental Protection ("NJDEP").

 For the reasons that follow, we affirm the three orders.

 I.

 A.

 The condemned property consists of four lots (collectively,

"the condemned tract") designated on the Newark City tax map as

Block 2025, Lot 20, Block 2473, Lots 1 & 2, and Block 2473.01, Lot

4. The first three lots border the Passaic River along one side

and, to a considerable extent, the Morris Canal Bed along the

other. The fourth lot borders the opposite side of the Morris

Canal Bed along one side and Raymond Boulevard along the other.

A section of Brill Street perpendicular to Raymond Boulevard

provided access to the condemned tract. The City of Newark vacated

this section of Brill Street in 1999.

 The County filed a verified complaint on January 29, 2010,

seeking, among other relief: a determination that it had duly

exercised its power of eminent domain; an order authorizing it to

 3 A-1651-14T4
deposit funds upon the contemporaneous filing and recording of a

declaration of taking; and the appointment of commissioners to

render an equitable appraisal of the condemned tract. The trial

court granted the relief the County sought, the owners appealed,

and we affirmed the trial court's August 24, 2010 order for

judgment and appointing commissioners. Cty. of Essex v. Rubin,

No. A-0714-10T3 (App. Div. June 24, 2011).

 Lengthy discovery ensued. Following completion of discovery,

the County filed a motion for partial summary judgment seeking an

order fixing the date for valuation of the condemned tract. The

trial court granted the motion on March 22, 2013, and entered an

order providing "the date of valuation for the condemnation value

litigation shall be April 14, 2010 in accordance with N.J.S.A.

20:3-30(a)", the date the County filed the declaration of taking.

On May 6, 2013, the court denied the owners' motion for

reconsideration.

 At the conclusion of a July 23, 2014 hearing, the court

determined that the owners' expert would be permitted to opine at

trial that a 4043.6 square foot portion of the vacated Brill Street

should be included in the condemned tract's valuation. The court

explained that the County could cross-examine the expert and

"maybe, even offer witnesses at some future date to offer contrary

opinions. I don't know about that."

 4 A-1651-14T4
 The matter was tried in September 2014 and the jury returned

a verdict of $5,045,000 as just compensation to the owners for the

County's acquisition of their property. This appeal followed.

 B.

 The summary judgment motion record consisted mostly of

undisputed facts and disputed expert reports. The record

established three periods of activity relevant to this appeal.

During the first period, from 1996 to 2003, the County sought to

acquire the condemned tract but abandoned its efforts to do so.

During the second period, 2003 through 2005, the County informed

the owners of its renewed intention to acquire the condemned tract,

the parties engaged in unsuccessful negotiations concerning just

compensation, and the owners ultimately filed an inverse

condemnation action. The third period, from 2006 through 2010,

culminated in the County filing a declaration of taking and

depositing the sum it believed to be just compensation for its

acquisition.

 The first event of the first period occurred in 1996 when the

City of Newark agreed to allow the County to build a jail in the

city on the condition the County build a minor league baseball

stadium and soccer stadium on County land located in Newark. Essex

Cty. Improvement Auth. v. RAR Dev. Assocs., 323 N.J. Super. 505,

510 (1999). The County agreed to use Riverbank Park as the

 5 A-1651-14T4
location of the stadiums. Ibid. The County also agreed to build

a "replacement park" near Riverbank Park. Id. at 510-11.

 The Essex County Improvement Authority ("ECIA") identified

the condemned tract as the then-anticipated site for the

replacement park. RAR Development Associates ("RAR") owned the

condemned tract. Defendant Rubin was RAR's general partner. Id.

at 511. After making two offers to buy the condemned tract from

RAR and taking preliminary steps to acquire the tract through

eminent domain, ECIA abandoned its efforts. Ibid. Litigation

ensued and a Law Division judge determined ECIA was precluded

"from continuing to prosecute the present condemnation action

against RAR." Id. at 528. The judge declared the condemnation

of RAR's property abandoned. Ibid.

 In July 2001, RAR filed a development application with the

Newark Board of Adjustment seeking a use variance and site plan

approval for the proposed construction of ninety townhouses and a

playground on the condemned tract. Newark's zoning officer

rejected the application because, among other reasons, the

application "appear[ed] to include properties not owned by the

applicant . . ., namely, the Morris Canal Bed"; and because the

site was "subject to the WaterFront Development Permit process and

regulations with the [NJDEP]." RAR did not further pursue the

 6 A-1651-14T4
condemned tract's development, though it repeatedly threatened to

do so during the second period relevant to this appeal.

 The second relevant period began on December 3, 2003, when,

during a town council meeting, the City of Newark adopted two

ordinances, both intended to facilitate the County's acquisition

of the condemned property and construction of a park. During the

meeting, a council member publicly stated the County Executive had

made a commitment to build the park. The council member also

stated that as soon as the ordinances were adopted, "they will

move into condemning the . . . property, obtaining the property

and move on in building the replacement park."

 Two days later, on December 5, 2003, ECIA Special Counsel

wrote to defendant Rubin, stating:

 [t]he County and the City of Newark have been
 working on a cooperative basis to restart the
 Replacement Park Project.

 . . . .

 Hopefully, the RAR Property can be acquired
 by the County or the ECIA through a mutually
 acceptable Purchase and Sale Agreement. If
 mutually acceptable terms concerning such
 property acquisition cannot be reached, the
 County or the ECIA will seek to acquire the
 RAR property through exercise of their
 respective powers of eminent domain.

 The December 5, 2003 letter triggered more than a year's

exchange of letters and meetings among RAR, Rubin, and County

 7 A-1651-14T4
Counsel concerning the condemned tract's value. Rubin asserted

the condemned tract's value had been affected by the longstanding

"threat of condemnation." Rubin also threatened to "commence

active development plans for the RAR properties." Nonetheless,

the parties continued to negotiate while the County obtained

appraisals for the condemned tract.

 The County obtained two appraisals. On July 20, 2004, County

Counsel wrote to Rubin and confirmed the County had offered

$4,200,000 to purchase the condemned tract. In a lengthy response

dated July 26, 2004, Rubin memorialized RAR's rejection of the

offer and confirmed he had been told the offer was final.

Consequently, Rubin expected the County to "either file a

Declaration of Taking or abandon the [p]roperty as a proposed

park." He concluded: "[i]f we do not get a response to this letter

within fifteen (15) days, we will assume the County is abandoning

its interest in the [p]roperty as a proposed park and my client

will immediately proceed with development plans."

 In response, County Counsel wrote to Rubin on August 9, 2004,

pointing out the County had delivered copies of appraisals to

Rubin. The valuations in the appraisals "ranged from a low of

$3,698,000 to a high of $4,300,000." The County further pointed

out that its offer of $4,200,000 "exceeded both appraisal

valuations where RAR had no interest in the Morris Canal [B]ed."

 8 A-1651-14T4
 In an October 28, 2004 letter, Rubin confirmed a meeting in

which he countered, on behalf of RAR, with an offer to sell the

condemned tract for $5,000,000 "to settle this matter even though

[RAR] believes that the fair market value of the [p]roperty is

substantially in excess of $5,000,000."1 Rubin further confirmed

the County had rejected RAR's counteroffer and insisted it would

not purchase the condemned tract for more than $4,300,000.

 On March 9, 2005, in response to County Counsel telling Rubin

he had offered no evidence that the County's appraisals were

inaccurate, Rubin provided a report from Appraisal Consultants

Corp. ("Appraisal Consultants"). In the February 1, 2005

appraisal, the value of the condemned tract, based on the

assumption RAR had no right or interest in the Morris Canal Bed,

was $9,460,000. Assuming RAR had rights in the Morris Canal Bed,

the condemned tract's value was $11,000,000. The parties exchanged

additional correspondence in which County Counsel enclosed reports

from the County's appraisers challenging as unreliable the data

relied upon by RAR's appraisers.

 The parties' negotiations ended on May 25, 2005, when Rubin

wrote to County Counsel confirming RAR had rejected the County's

1
 We discern no violation of N.J.R.E. 408 in discussing the history
of the parties' settlement negotiations in this context, given the
special relevance of the negotiations to the condemnation issues.

 9 A-1651-14T4
final "firm" offer of $4,700,000. Rubin concluded his three-page

letter by stating, "[i]t is the position of my client that the

County's actions have resulted in a condemnation of their property.

We are in the process of instituting a suit against the County

taking the position that the County's actions have resulted in the

condemnation of their property. We will file that suit within two

weeks unless we can reach a mutually acceptable agreement with

respect to the status of my client's property."

 In November 2005, JAGR Three Realty, L.L.C., successor to

RAR, filed an inverse condemnation action against the City of

Newark, the County, and ECIA. Later that month, counsel for Rubin

and JAGR wrote a letter to County Counsel confirming the County

had once again offered to purchase the condemned tract for

$4,700,000, and the offer had once again been rejected. JAGR

agreed to accept the sum of nine million dollars as the purchase

price.

 Thereafter, the owners leased portions of the condemned

tract. According to the County, the court dismissed JAGR's inverse

condemnation action on September 20, 2007, pursuant to Rule 1:13-

7 for lack of prosecution.2

2
 According to the County's brief, the Essex County Superior Court
Clerk's file was destroyed on April 17, 2009.

 10 A-1651-14T4
 The third period relevant to this appeal began on December

2, 2009, when the County offered to purchase the condemned tract

for $3,330,000. The owners rejected the offer, and on January 29,

2010, the County filed a verified complaint seeking the following

relief: a determination that it was authorized to, and had, duly

exercised its power of eminent domain; an order instructing the

County to deposit funds equal to the appraised value of the

condemned tract upon the filing and recording of a declaration of

taking and declaring that the County was authorized to take

possession of the condemned tract; and the appointment of

commissioners to make a just and equitable appraisement of the

value of the condemned tract and to fix compensation to be paid

for its acquisition. The owners filed an answer in which they

alleged, among other things, the proper date of valuation of the

condemned tract was November 3, 2005.

 On August 24, 2010, the trial court entered judgment as

requested by the County. The owners appealed, arguing the County

failed to engage in bona fide negotiations to acquire the condemned

tract and failed to serve them with the appraisal before filing

the verified complaint. We affirmed the August 24, 2010 order for

judgment and appointing commissioners. Cty. of Essex, supra, No.

A-0714-10. Thereafter, appointed commissioners filed an award,

which was rejected.

 11 A-1651-14T4
 Following discovery, the County filed a motion for partial

summary judgment, seeking an order fixing a valuation date for the

condemned tract. The County argued the valuation date should be

April 14, 2010, the date on which the County became vested with

title and possession of the condemned tract by filing the

Declaration of Taking and depositing the estimated compensation.

The owners argued the valuation date should be July 1, 2005, the

date they claimed the use and enjoyment of the condemned tract was

substantially affected by the County's actions.

 The summary judgment record included appraisal reports

prepared for the owners. The reports were included in the County's

moving papers. One, prepared by Appraisal Consultants, dated June

1, 2012, concluded that as of July 2, 2005, the fair market value

of the condemned tract was $9,460,000 assuming no rights, title

or interest in the Morris Canal Bed; and $11,000,000 assuming full

rights, title or interest in the Morris Canal Bed. Another,

prepared by Blau Appraisal Company and dated November 13, 2009,

appraised the value of the condemned tract as of November 2, 2005,

at $11,825,000 assuming no rights in the Morris Canal Bed, and

$13,750,000 assuming full rights in the Morris Canal Bed.

 According to both reports, the highest and best use of the

condemned tract was residential development. The Appraisal

Consultants' report stated:

 12 A-1651-14T4
 [d]ue to the County's actions and inactions
 as of July 1, 2005[,] the property owner could
 . . . [o]nly rent the property on a short term
 basis[; could n]ot prepare [and file] a
 development plan[,] . . . make any substantial
 development plans to enhance the property's
 value[, or] sell the property to a developer
 or lease the property on a long term basis to
 a user who required substantial improvements
 be made to the property.

The report also stated:

 In conjunction with the property's loss of use
 and enjoyment there would also be a
 significant loss in its market value resulting
 from its loss of its bundle of rights and
 relegating the use and utility of the property
 to short term rental status for use solely as
 outside storage. No purchaser or developer
 would give any value to the property for
 development to its highest and best use which
 is and was for residential or for any other
 development use.

 The report's author opined that sellers and buyers would have

no motivation to sell or buy the property "for development for

residential use (its highest and best use), for development for

an industrial building, office building, retail, or any other use

that necessitated making substantial improvements to the

[p]roperty due to the significant uncertainties (cloud) hovering

over" the property. He continued:

 The fact that there was no response relating
 to the March 11, 2004 and April 8, 2005 letters
 from Rubin to the County and the County's
 statement that it was "not going to do
 anything" as a result of impasse in
 negotiations had a marked deleterious effect

 13 A-1651-14T4
 on the subject property due to its serious
 chilling [e]ffect on any attempt on the part
 of the owner to either market or develop the
 property and therefore caused a substantial
 downward fluctuation in its value. Given that
 vacant land's most profitable use is for it
 to be developed, the loss and value suffered
 by the [owners] as a result of their inability
 to effectively develop the property was in
 excess of $5,000,000 as specifically detailed
 below.

 The author estimated the current value of the condemned tract

based on the proposition that "the only use that the land could

be used for is for outside storage short[-]term rental." Employing

"[a]n accepted valuation technique for estimating land value[,

namely,] to capitalize the net rent derived from the rental of the

land[,]" the author valued the condemned tract based on current

use at $4,436,000 assuming no rights, title or interest in the

Morris Canal Bed, and $5,138,000 assuming full rights, title or

interest the Morris Canal Bed. The author compared these values

to the condemned tract's values based on a highest and best use

as residential development: $9,460,000 assuming no rights, title

or interest in the Morris Canal Bed, and $11,000,000 assuming full

rights, title or interest in the Morris Canal Bed. The author

concluded that the cloud over the property due to the County's

actions and inactions resulted in a diminution in the property's

market value of a minimum of $5,000,000.

 14 A-1651-14T4
 The Blau report was prepared for use by JAGR III Realty in

its inverse condemnation action against the City of Newark, the

County, and ECIA. The purpose of the report was "to develop an

opinion of the market value of the [property] as of November 2,

2005." Based upon the Sales Comparison Approach to value, the

Blau report's author valued the condemned tract, assuming the

owners had no interest in the Morris Canal Bed, at $11,825,000;

and, assuming a developable interest in the Morris Canal Bed, at

$13,750,000.

 The trial court determined a hearing was unnecessary, found

the owners had not demonstrated the County engaged in conduct that

substantially affected their use and enjoyment of the condemned

tract, and fixed April 14, 2010 as the valuation date. In making

its determination, the court was "persuaded by the County's

argument" that in this case "like the Stanley3 case, the alleged

decrease in property value occurred in the gray shadow in the 2007

and 2008 financial crises." Noting the owners' argument that

their expert had selected a July 2005 valuation date based on the

"totality of circumstances," the court characterized the Appraisal

Consultants' report as "set[ting] forth little more than bare

conclusions."

3
 Mt. Laurel Twp. v. Stanley, 185 N.J. 320 (2005).

 15 A-1651-14T4
 Trial ensued and resulted in the judgment from which the

parties appeal.

 II.

 We first address the owners' arguments. They contend that

in fixing the valuation date, the trial court misapplied the

summary judgment standard and decided the motion on the papers

rather than on evidence presented at a plenary hearing. They also

contend the court misapplied relevant case law and improperly took

judicial notice of the recession that began in 2007. The owners

argue the trial court also erroneously denied their motion for

reconsideration.

 We review "[a] ruling on summary judgment . . . de novo."

Davis v. Brickman Landscaping, Ltd. 219 N.J. 395, 405 (2014)

(citing Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115

(2014)). In determining whether summary judgment was proper, an

appellate court applies the same standard as that which governed

the trial court and views "the evidence in the light most favorable

to the non-moving party." Nicholas v. Mynster, 213 N.J. 463, 477-

78 (2013) (citing Murray v. Plainfield Rescue Squad, 210 N.J. 581,

584 (2012)). Rule 4:46-2(c) requires that the trial court grant

a summary judgment motion "when the record demonstrates . . .

'there is no genuine issue as to any material fact challenged and

 16 A-1651-14T4
. . . the moving party is entitled to a judgment or order as a

matter of law.'" Davis, supra, 219 N.J. at 405-06.

 A motion for summary judgment will not be defeated by bare

conclusions lacking factual support, Petersen v. Twp. of Raritan,

418 N.J. Super. 125, 132 (App. Div. 2011) (citation omitted), self-

serving statements, Heyert v. Taddese, 431 N.J. Super. 388, 414

(App. Div. 2013), or disputed facts "of an insubstantial nature."

Pressler & Verniero, Current N.J. Court Rules, comment 2.1 on R.

4:46-2 (2017). "Competent opposition requires 'competent

evidential material' beyond mere 'speculation' and 'fanciful

arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super.

415, 426 (App. Div. 2009) (citations omitted).

 Turning to the Act, the section that addresses the date on

which just compensation is to be fixed states in pertinent part:

 Just compensation shall be determined as of
 the date of the earliest of the following
 events: (a) the date possession of the
 property being condemned is taken by the
 condemnor in whole or in part; (b) the date
 of the commencement of the action; (c) the
 date on which action is taken by the condemnor
 which substantially affects the use and
 enjoyment of the property by the condemnee;
 or (d) the date of the declaration of blight
 by the governing body . . . .
 [N.J.S.A. 20:3-30.]

 "The question whether and when a landowner's use and enjoyment

of his or her property has been 'substantially affected' under

 17 A-1651-14T4
N.J.S.A. 20:3-30(c) is a mixed question of law and fact." Twp.

of W. Windsor v. Nierenberg, 150 N.J. 111, 135 (1997) (citation

omitted). For purposes of subsection (c), "[a] substantial effect

upon the use and enjoyment of property is occasioned when the

condemnor takes action which directly, unequivocally and

immediately stimulates an upward and downward fluctuation in value

and which is directly attributable to a future condemnation." Id.

at 129-30 (quoting New Jersey Sports & Exposition Auth. v. Giant

Realty Assocs., 143 N.J. Super. 338, 353 (Law Div. 1976)). "A

'clearly observable and direct interference which is directly

related to condemnation' must exist if a substantial effect is to

be found." Id. at 130 (quoting New Jersey Sports & Exposition

Auth., supra, 143 N.J. Super. at 353-54).

 In West Windsor, the Township sent the condemnees a letter

notifying them it had received funding to develop a community park

on the condemnees' property and might acquire the property. Id.

at 117. The Court held "the trial court properly found that the

date of the Township's letter set the date of valuation." Id. at

137. The Court cautioned, however:

 That determination should not discourage
 municipalities from responsibly notifying
 potential condemnees of an intention to
 condemn. See N.J.S.A. 20:3-6 (dictating that
 [the] condemnor must engage in bona fide
 negotiations that include written offer to
 purchase before initiating condemnation

 18 A-1651-14T4
 proceedings). Nor should our disposition be
 viewed as penalizing condemnors. The
 objective of N.J.S.A. 20:3-30(c) is neither
 to reward nor to punish either party to a
 condemnation. Rather, it is to establish
 value at the time that the condemnor's actions
 substantially affect the landowners use and
 enjoyment of her property.

 [Ibid. (citation omitted).]

 In the case before us, we conclude the summary judgment record

contained insufficient factual support to create a genuine issue

as to whether the County's actions directly, unequivocally and

immediately stimulated an upward or downward fluctuation in the

value of the owner's property as of July 2, 2005 – as stated in

the owner's Appraisal Consultants' appraisal.4 The Appraisal

Consultants' report states the condemned track was "substantially

affected and as a result thereof its value impacted as of July 1,

2005 by the actions and inactions of the condemning authority

(County of Essex)." The expert's selection of that date is

arbitrary.5

 First, the expert opines that as of that date, the owners

could not effectively list the property for sale at its highest

and best use, prepare a development plan and present the plan

4
 Because our review is de novo, our agreement with the trial
court's ultimate conclusion should not be read as agreeing with
the trial court's reasoning.
5
 The owners do not assert on appeal that November 2, 2005 should
be considered as an alternate valuation date.

 19 A-1651-14T4
before a city planning or zoning board of adjustment, make any

substantial development plans to enhance the property's value,

sell the property to a developer, or lease the property on a long

term basis. The expert does not explain why, if these were the

critical factors causing a diminution in value, these same factors

did not have the same effect in December 3, 2003, when the County

sent the letter to the owners notifying them of its intent to

exercise its power of eminent domain.

 In addition, the February 5, 2005 Appraisal Consultants'

report stated the valuation of the condemned tract was $9,460,000

without the Morris Canal Bed, and $11,000,000 with the Morris

Canal Bed. The November 13, 2009 Blau appraisal stated the value

of the condemned tract as of November 2, 2005, was $11,825,000

without the Morris Canal Bed, and $13,750,000 with the Morris

Canal Bed. Considered collectively, these reports suggest there

was no change in the condemned tract's value between February and

July 2005, but an increase of more than $2,000,000 between July

and November. The Appraisal Consultants' report is silent as to

what economic conditions were causing such an upward spiral in

2005, whether the same market forces were at work in December 2003

when the County announced to Rubin its intention to acquire the

property, and why the value of the condemned property was

significantly different in 2010. Throughout those years, the

 20 A-1651-14T4
County's commitment to acquire the condemned tract had not changed.

Thus, the owners' selection of July 2005 as the valuation date was

arbitrary and perhaps, as the County contends, a date the experts

backed into to take advantage of an upward surge in land use

values.

 Perhaps more significantly, to justify the July 1, 2005

valuation date, the Appraisal Consultants' report emphasizes the

author's interpretation of the impact of negotiations between

Rubin and the County. We reject the notion that a condemnee's

legal maneuvering during negotiations should be a substantial

factor in determining a valuation date for condemned land. Such

a proposition is unsound and without precedential support.

 On appeal, the owners do not insist that July 1, 2005, is

necessarily the fixed date for valuation of the condemned tract;

rather, they argue "the appropriate date for the valuation was no

later than July 1, 2005 when negotiations between the parties had

broken off for the voluntary acquisition of the [condemned tract]

by the County." The owners note their expert, in the June 1, 2012

Appraisal Consultants' report, "concluded that the concerted

actions of the County and the City from December 2003 through July

2005 had substantially affected the use and enjoyment of the

[condemned tract], causing a dramatic diminution of the value of

 21 A-1651-14T4
the [condemned tract]." That argument underscores the arbitrary

nature of selecting July 1, 2005 as a valuation date.

 First, the argument that the valuation of condemned property

should be fixed somewhere along a nineteen-month temporal spectrum

overlooks the requirement that, to be substantial, the effect of

a condemnor's action upon the use and enjoyment of the condemnee's

property must "directly, unequivocally, and immediately

stimulate[] an upward or downward fluctuation in value." W.

Windsor, supra, 150 N.J. at 129 (emphasis added) (citation

omitted).

 Second, unlike the matters in West Windsor and Stanley, here

there was no evidence in the motion record that the County's

December 2003 letter had any direct effect on the property's

valuation. In West Windsor, the condemnee had filed a development

application for a forty-eight-lot residential subdivision before

receiving the Township's letter providing formal notification the

Township intended to acquire the property for the purpose of

establishing a park. Supra, 150 N.J. at 116-17. According to the

condemnee's expert, the condemnee's "final plan conformed with the

municipal zoning ordinance." Id. at 116. Moreover, the

condemnee's attorney testified that "it was 'a relatively

straightforward submission.'" Ibid.

 22 A-1651-14T4
 In contrast, in the case before us, the owners had filed a

development application which had been rejected before the County

informed the owners in December 2003 of its intent to exercise its

power of eminent domain. The owners had not pursued development

of the property in the interim. Thus, unlike West Windsor, the

County's letter concerning its intent to acquire the condemned

tract had no immediate effect on pending plans to develop the

tract.

 In short, there was no evidence on the summary judgment motion

record that created a genuinely disputed issue of material fact

as to when the County's action "directly, unequivocally, and

immediately stimulated an upward or downward fluctuation in value

. . . directly attributable to a future condemnation," id. at

129-30; and what the value of the condemned tract was at such

time. The owners' selection of the July 2005 date was

demonstratively arbitrary. The owners' argument that the County's

action substantially affected the value of the condemned tract

sometime between December 2003 and July 2005 does not satisfy the

requirement that a condemnor's action immediately stimulate an

upward or downward fluctuation in value.

 Lastly, there was no competent evidence in the motion record

from which the trial court could have inferred the value of the

condemned tract had directly, unequivocally, and immediately been

 23 A-1651-14T4
affected by "[a] 'clearly observable and direct interference which

is directly related to condemnation[.]'" Id. at 130 (citation

omitted).

 For the foregoing reasons, we affirm the trial court's order

fixing the date the County filed the declaration of taking as the

valuation date.

 III.

 On cross-appeal, the County contends the trial court

committed three errors. First, the County contends the court

erred by permitting the owners' expert to include in his valuation

the 4043.60 square foot portion of Brill Street (the "Brill Street

parcel"). Second, the County contends the court erred by

precluding its expert from explaining the purchaser of a property

comparable to defendants' had a particular need for a functioning

waterfront. Lastly, the County contends the court erred by

declining to instruct the jury the property was subject to an

NJDEP regulation. These arguments are without sufficient merit

to warrant extended discussion. R. 2:11-3(e)(1)(E).

 Concerning the County's argument regarding the Brill Street

parcel, the court determined the owners' expert could testify

about why the Brill Street parcel should be included in the

valuation, but permitted the County to adduce contrary expert

testimony. Rather than doing so, before trial, the County informed

 24 A-1651-14T4
the owners in a pretrial email, "[y]ou don't need to call [the

expert] at trial. We are both valuing 5.346 acres[.]" During

voir dire, the court instructed the jury the County "acquired a

5.346 acre property" and the court repeated this in its final

instructions. Thus, it appears from the record the County conceded

the condemned tract consisted of 5.346 acres.

 Next, the trial court acted well within its discretion in

determining the County's expert's testimony concerning a

comparable parcel's owner's motivation for purchasing the property

should be excluded. The decision was not so wide of the mark that

a manifest denial of justice resulted. State v. Sands, 76 N.J.

127, 140 (1978); State v. Carter, 91 N.J. 86, 106 (1982).

Moreover, the purpose of the testimony was to demonstrate the

adjacent property had a bulkhead and deeper water along its

riverfront border, thus making it accessible to certain vessels,

unlike the condemned tract. For that reason, the County's expert

opined that an adjustment had to be made to this "comparable."

The trial record demonstrates the court permitted the expert to

fully explain these considerations. Consequently, even if it was

error to exclude testimony that the comparable party's owner

purchased the property for these reasons, the error was harmless.

R. 2:10-2.

 25 A-1651-14T4
 Lastly, the trial court acted well within its discretion when

it declined to give the County's proposed instruction concerning

an NJDEP waterfront development regulation. The court refused to

give the instruction because the County had presented insufficient

testimony through its expert to make the instruction meaningful.

We agree that without underlying supporting testimony, the

instruction would have been either confusing or meaningless to the

jury.

 IV.

 For all the foregoing reasons, we affirm the orders of the

trial court in their entirety, including the order entering

judgment.

 Affirmed.

 26 A-1651-14T4